**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

JAMES VOSOTAS[1],                              Case No. 23-18073-LMI
                                              Chapter 7
     Debtor.

_____/                       Adv. No. _____

BBM3, LLC, a Delaware limited liability company,
GREYSTONE HOTEL MIAMI, LLC, a Delaware
limited liability company, GREYSTONE TENANT,
LLC, a Delaware limited liability company, SANTA
BARBARA 230, LLC, a Delaware limited liability
company , GREYSTONE MANAGING MEMBER,
LLC, a Delaware limited liability company,
GREYSTONE MASTER TENANT, LLC, a
Delaware limited liability company, GREYSTONE
HOLDCO, LLC, a Delaware limited liability
company, USBCDC INVESTMENT FUND 180,
LLC, a Missouri limited liability company, and
BRANDEN MUHL, individually,

     Plaintiffs,
v.

JAMES VOSOTAS ,

     Defendant.

_____/

**COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE**
**AND TO DETERMINE DISCHARGEABILITY OF CERTAIN DEBTS**

     Creditors, BBM3, LLC, Greystone Hotel Miami, LLC, Greystone Tenant, LLC, Santa

Barbara 230, LLC, Greystone Managing Member, LLC, Greystone Master Tenant, LLC,

Greystone Holdco, LLC, USBCDC Investment Fund 180, LLC, and Branden Muhl (collectively,

the "Plaintiffs" or "Creditors"), through counsel, sue Debtor/Defendant, JAMES VOSOTAS

---

[1] The Debtor's last known address is 1551 Delgado Avenue, Miami, FL 33146 and the last four digits of the Debtor's
social security number are 6316. *See* 11 U.S.C. § 342(c)(1).

(hereinafter, the "Debtor" or the "Defendant"), pursuant to 11 U.S.C. §§ 523 and 727, and Fed. R.

Bankr. P. 7001, and alleges as follows:

## TABLE OF CONTENTS

I.    SUMMARY OF THE CASE ……………………………………………… 5

II.   JURISDICTION & VENUE……………………………………………… 5

III.  THE PARTIES AND OTHER RELEVANT PERSONS

      AND ENTITIES……………………………………………..……………... 6

      A. The Parties……………………………………………..……………… 6

      B. Other Relevant Persons and Entities…………………………....……… 10

IV.   GENERAL ALLEGATIONS COMMON TO ALL COUNTS …………………… 12

      A. The Debtor's Bankruptcy Case - Overview…………………………… 12

      B. Pre-Petition Dealings Between Creditors and Debtor –

      The Greystone Hotel…………………………………………………... 12

         1. The Initial Inducement - Founding, Acquisition, and Financing……………… 15

         2. The Debtor's Initial Defaults to BBM3 and BBM3 II…………………………... 17

         3. Early Outside Tax Credit Financing…………………..………………………… 19

            a.  US Bank Fed'l Historic Rehabilitation Tax Credit Financing (Phase I) ….. 19

            b.  The 2016 Tax Credit Contribution Agreement………………………...……… 21

            c.  QLICI New Markets Tax Credit Financing………………………………… 23

         4. The Management Agreements…………….…..……………………………..…… 24

         5. Later Outside Financing - The Construction Loan and Related Agreements… 25

            a.  The Guaranties……………………………………………………………… 26

            b.  The Pledge Agreements……………………………………...…..………...…… 27

            c.  The Assignment and Subordination of Management Agreements………… 29

         6. The Holdco Contribution Agreement…………………………………………… 29

         7. The 2018 Construction Loan Defaults……………….………………………..…… 30

         8. BBM3 Bails Out the Debtor and Saves the Hotel, Becoming Moinian's

         Successor-in-Interest …………….……..……………………………………… 31

         9. The Construction Loan Maturity Default – The Debtor Has No Intention to

         Satisfy and Lures BBM3 Deeper into the Hole…………….…..……………....…  34

    **10. The Debtor's 2019 Financial Statements**…………..……………….………  35

    **11. Federal Historic Rehabilitation Tax Credit Financing (Phase II)** ……………..  36

    **12. Debtor's Bad Acts, Mismanagement and Removal**…………..……………… 37

        **a. Misappropriation of Construction Loan Funds Through**

        **False Draw Requests**………………………………………………....…..  37

        **b. Termination of VOS Hospitality Management Agreement**……………........  40

        **c. Removal of Debtor as Manager of GMM (and by association,**

        **as a control person of GMT), Holdco, and GHM**……………..……………  40

        **d. A Parting Gift – The Debtor Solicits Third Party Litigation**

        **Against the Greystone Hotel**……………………………………………..  42

    **13. All the While and Concealed - Formation of VOS CRE I, LLC**

    **to Secretly Solicit "Investments" and Subsequent Investor Litigation**…………42

**C. The Fallout, Litigation, and Debtor's Fraud and Malicious Acts**……………….....  46

    **1. No Good Deed Goes Unpunished - the Debtor's Mess**

    **becomes the Creditors' Headache**……………………………………………  46

        **a. EB-5 Investors File Suit**………………………………………………………  46

        **b. Turner Construction and Other Construction Vendor Claims** ……………  48

        **c. Preferred Hotel Group Commences Litigation at Debtor's Behest** ………..  49

        **d. SARC Bankruptcy Estate** …………………………………………………  49

        **e. Michigan Investor Litigation** ……………….……………...................………  50

        **f. Malicious Sunbiz Filings** ……………………………………………………  50

    **2. Fallout Litigation Between Creditors and the Vosotases**……………..……….. 50

        **a. BBM3's Judgments Against the Debtor and Enforcement Efforts**………... 50

            *1. The New York Action and Judgment*………....................……… 50

            *2. Judgment Enforcement Efforts in Michigan*……….................... 51

            *3. Judgment Enforcement Actions In Florida*

            *and FL Judgment*……….................……………………… 52

        **b. *The Derivative Action*** ………….………………………………… 53

        **c. *The Indemnification Action***…………….………………………………… 55

        **d. *QLICI Guaranty Action*** …………….………………………………… 56

    **3. VOS CRE I Bankruptcy**…………….....……………………………………… 58

    4. **A Father's and Son's Efforts to Evade Creditors, the**
        **Debtor's Sham Dissipation of Assets and Income, and**
        **Father's Subsequent "Support" of the Debtor** …………………………….. **61**
        a. **The Debtor is a Ghost Director or Officer of Insiders' Businesses**………. **64**
        b. **The Real Property Acquisition**………….……………………………… **64**

D. **Debtor's False Oaths, Failure to Disclose Assets, and**
  **Deficiencies in the Bankruptcy** …………..……………………………………… **67**
    1. **Business Interests, Transfers Thereof, and Prior Sworn Statements** …….. **67**
    2. **VOS Holdings I Member Loans to Debtor**.................................................. **75**
    3. **Undisclosed Income** ...................................................................................... **76**
    4. **Undisclosed Debt Obligations**...................................................................... **76**
    5. **The Trusts**...................................................................................................... **76**
    6. **Cryptocurrency and Digital Assets**.............................................................. **77**
    7. **Portara**............................................................................................................ **77**
    8. **Undisclosed Transfers**.................................................................................. **78**
    9. **Other Material Non-Disclosures**.................................................................. **79**
    10. **Debtor's Failure to Keep and Preserve Records**…………………………….. **80**
    11. **Failure to Explain or Account for Loss or Diminution in Assets**…………. **82**

V.     **RESERVATION OF RIGHTS**…………………………………………….. **83**
VI.    **CAUSES OF ACTION** ………………………………………………………. **84**
      *a. 11 U.S.C. § 523(a)(2)(A)* …………………………………………….. **84**
      *b. 11 U.S.C. § 523(a)(2)(B)* …………………………………………….. **86**
      *c. 11 U.S.C. § 523(a)(4)* …………………………………………………**87**
      *d. 11 U.S.C. § 523(a)(6)* ……………………………………………….. **89**
      *e. 11 U.S.C. § 727(a)(2)* ………………………………………………..**91**
      *f. 11 U.S.C. § 727(a)(3)* ……………………………………………….. **92**
      *g. 11 U.S.C. § 727(a)(4)(A)* …………………………………………… **93**
      *h. 11 U.S.C. § 727(a)(5)* ……………………………………………….. **94**

## I.    SUMMARY OF THE CASE

1.    The only "real estate development" the Debtor can legitimately be credited for over the last decade is a house of cards rife with falsities, concealments, and bad acts. The Debtor's and his insiders' roles in the Greystone Hotel project, and his subsequent efforts to evade creditors, give rise to the instant action.

2.    As detailed below, the Debtor and his insiders have cycled through a pattern of improper conduct with the Creditors – (1) induce with false representations, (2) gain access of funds and businesses belonging to the Creditors, (3) misappropriate, mismanage, and cause defaults and other material failures - then rinse and repeat.

3.    As this malicious and expensive cycle repeated to the Creditors' detriment, the Debtor and his insiders were running concurrent schemes on other investors across the country.

4.    And when jig looked like it was up and the Debtor had a $19 million judgment entered against him, the Debtor schemed to ultimately appear before this Court jobless, penniless, and living off the alleged good graces of his father – the co-creator of his house of cards.

5.    While the facts are exhaustive, the conclusion is simple.  The Debtor committed bad acts pre-petition.  The Debtor failed to do his job in this case. Thus, the Debtor is not entitled to discharge the debts of his Creditors nor entitled to a discharge generally.

## II.    JURISDICTION & VENUE

6.    This is an adversary proceeding filed under Federal Rule of Bankruptcy Procedure Rule 7001, et seq., to object to the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2), 727(a)(3), 727(a)(4)(A), 727(a)(4), and 727(a)(5) and determine dischargeabilty of certain debts pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6).

7.      This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.

8.      This is a core proceeding pursuant to the provisions of 28 U.S.C. § 157(b).

9.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1409.

### III.    THE PARTIES AND OTHER RELEVANT PERSONS

#### A.  The Parties

10.     BBM3, LLC ("BBM3") is a Delaware limited liability company with its principal place of business in Dallas, Texas. BBM3 is a Member of Greystone Holdco, LLC, Lender to Greystone Tenant, LLC and Santa Barbara 230, LLC, Pledgee of Greystone Managing Member, LLC, Greystone Hotel Miami, LLC and Greystone Holdco, LLC, and is a creditor of the Debtor, including but not limited to as a judgment creditor by virtue of the NY Judgment and FL Judgment (each defined below), and claims arising from the Debtor's guarantee of indebtedness, among other claims, and has standing to brings the claims set forth hereinbelow.

11.     Greystone Hotel Miami, LLC ("GHM") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. GHM is a Borrower & Pledgor to BBM3, LLC. GHM is a creditor of the Debtor by virtue of claims arising from the Debtor's unauthorized misappropriation of GHM loan funds from SARC and resulting litigation, among other claims, and has standing to brings the claims set forth hereinbelow.

12.     Greystone Tenant, LLC ("Greystone Tenant") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Greystone Tenant is a Borrower of BBM3 LLC, is a creditor of the Debtor by virtue of the Debtor's guarantee of indebtedness, and claims arising from the Debtor's misappropriation of Greystone Tenant loan funds, among other claims, and has standing to brings the claims set forth hereinbelow.

13.     Santa Barbara 230, LLC ("Santa Barbara") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Santa Barbara is a Borrower of BBM3, LLC, is a creditor of the Debtor by virtue of the Debtor's guarantee of indebtedness, and claims arising from the Debtor's misappropriation of Santa Barbara loan funds, among other claims and has standing to brings the claims set forth hereinbelow.

14.     Greystone Managing Member, LLC ("GMM") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. The Debtor was previously a Member (50%) and Manager of GMM as of November 2016 but by 2020 was ultimately diluted, substituted, and removed as both a Member and a Manager as result of a variety of mortgage loan defaults, both financial and bad acts. GMM is a Borrower & Pledgor to BBM3 LLC. GMM is a creditor of the Debtor by virtue of claims arising out of the unwind of certain tax credit financing agreements alleged herein, among other claims and has standing to brings the claims set forth hereinbelow.

15.     Greystone Master Tenant, LLC ("GMT") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. GMM (1%) and US Bancorp Community Development Corporation (99%) are the Members of GMT and GMM is the managing member. GMT is a creditor of the Debtor by virtue of claims arising from the Debtor's misappropriation of GMT funds, and claims arising from the Debtor's actions for unauthorized entry of GMT into certain contractual obligations that resulted in litigation, among other claims and has standing to brings the claims set forth hereinbelow.

16.     Greystone Holdco, LLC ("Holdco") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Holdco is Pledgor to BBM LLC, is a creditor of the Debtor by virtue of claims arising from the Debtor's breaches of corporate and

transactional documents, including but not limited to commencement of litigation in violation of the same, among other claims, and has standing to brings the claims set forth hereinbelow.

17.    USBCDC Investment Fund 180, LLC ("USBCDC 180"), is a Missouri limited liability company with its principal place of business in Texas, is a creditor of the Debtor by virtue of Debtor's guarantee of indebtedness, among other claims and has standing to brings the claims set forth hereinbelow.

18.    Branden Muhl is an individual who resides in Dallas County, Texas, is over 18 years of age, and is otherwise *sui juris.* Muhl is the principal Member and Manager of BBM3 and is a Manager of Holdco, Greystone Tenant, Santa Barbara, GHM, GMM, GMT, and USBCDC 180, is a creditor of the Debtor by virtue of claims arising from the Debtor's mismanagement of the Project, claims arising from a variety of litigation asserted against Muhl as a result of the Debtor's misdeeds, and claims arising from the Debtor's willful and malicious injury and tortious interference with Muhl and Muhl-related entities, among other claims and has standing to brings the claims set forth hereinbelow.

19.    Defendant, James Vosotas (the "Debtor" or "J.Vosotas"), resides in Miami-Dade County, Florida, is the individual Debtor in the underlying Chapter 7 bankruptcy proceeding, and is subject to the jurisdiction of this Court.

20.    The Debtor has an extensive professional background in finance, real estate investment, development, and management. The Debtor worked at Citigroup's investment bank for over 5 years, specifically in the Commercial Real-Estate Capital Markets group. According to the current Trans Inns Management, Inc. website, the Debtor has structured over $13 billion of real estate securities, underwritten and originated over $2 billion in commercial real estate mortgage and mezzanine financings, and advised on over $10 billion of M&A transactions since

2004. The Debtor serves as President and Chief Operating Officer according to the Trans Inns Management, Inc. website. The Debtor holds a BS in mathematics and economics with honors from the University of Michigan and is a holder of the Chartered Financial Analyst designation. In short, the Debtor is a sophisticated business person with extensive commercial real estate knowledge and experience.

21.    The Debtor was a Manager of Holdco, is a Manager and Member of Greystone Hospitality, is a Manager and Member of VOS Holdings I, is a Manager and/or Member of VOS CRE I in addition to being its Authorized Corporate Representative in the VOS CRE I bankruptcy proceedings, is a Manger and Member of VOS Manager I (which is the Manager of VOS CRE I), is a Manager and Member of DW Detroit, is a Manager and Member of VOS Hospitality, is a Manager and Member of VOS Associates, is a Manager and/or Member of VOS Investments, is a Manager and/or Member of Portara.io, is or was an employee, President, Chief Operating Officer, and/or Director of Trans Inns Management + Trans Inns Associates, was the Manager of GHM, was the Manager of Greystone Tenant, was the Manager of Santa Barbara, was a Manager and a Member of GMM, is a Manager and Member of United EB-5, is a Manager and Member of Whitney Managing Member, is a Manager and Member of Whitney Master Tenant, is a Manager and Member of DCW Development, is a Manager and Member of DHB Construction, is a Manager and Member of 95 Rockwell Place, Rockwell Place Finance, and Rockwell Hospitality.

22.    Furthermore, the Debtor is the Successor Trustee and a Beneficiary of the Daniel J. Vosotas 1996 as well as the Family Trustee and Sole Beneficiary of the Daniel J. Vosotas Family Trust, and through his roles in the Daniel J. Vosotas Family Trust, is the control person and sole owner of Daniel J. Vosotas Enterprises LLC.

**B. Other Relevant Persons and Entities**

23.    Greystone Hospitality, LLC ("Greystone Hospitality") is a Florida limited liability company with its principal place of business in Palm Beach County, Florida. The Debtor and Daniel Vosotas are principals of Greystone Hospitality.

24.    Daniel Vosotas ("D. Vosotas; collectively with the Debtor, the "Vosotases") is an individual who resides in Palm Beach County, Florida. D. Vosotas is Debtor's father. At all times material to this action, D. Vosotas has been the Chief Executive Officer and/or Director of Trans Inns, a Manager and/or Member of VOS Hospitality, a Manager and/or Member of VOS CRE I, a Manager and/or Member of Greystone Hospitality, and purported to be a Member and/or Manager of GHM, Santa Barbara and Greystone Tenant in various sworn affidavits and other documents.

25.    VOS Hospitality, LLC ("VOS Hospitality") is a Florida limited liability company with its principal place of business in Palm Beach County, Florida. The Vosotases are principals of VOS Hospitality.

26.    Trans Inns Management, Inc. ("Trans Inns") is a Michigan corporation with its principal place of business in Bloomfield Hills, Michigan. D. Vosotas is the Chief Executive Officer and/or Director of Trans Inns. The Debtor is an employee, President, Chief Operating Officer, and/or Director of Trans Inns.

27.    VOS Holdings I, LLC ("VOS Holdings I") is a Florida limited liability company with its principal place of business in Palm Beach County, Florida. The Vosotases are principals of VOS Holdings.

28.    VOS Manager I, LLC ("VOS Manager I") is a Florida limited liability company with its principal place of business in Palm Beach County, Florida. The Vosotases are principals of VOS Manager.

10

29.     VOS CRE I, LLC ("VOS CRE I") is a Florida limited liability company.  VOS CRE I was an entity wholly unknown to Creditors during their pre-petition dealings with the Debtor and his insiders during the Project (defined below).  The Debtor and D. Vosotas were indirectly the majority owners and controllers of VOS CRE I, LLC until the VOS CRE I Bankruptcy (defined below), at which point the DJV Trust (defined below) became the sole owner.

30.     Daniel J. Vosotas Trust D/A/O February 2, 1996 ("DJV Trust") is a Michigan Trust. On information and belief, D. Vosotas is the Trustee, J. Vosotas is the Successor Trustee, and J. Vosotas is one of three direct beneficiaries of the DJV Trust.

31.     Daniel J. Vosotas Family Trust D/A/O July 25, 2022 ("Family Trust") is a Nevada Trust.  J. Vosotas is the Family Trustee and Sole Beneficiary.

32.     Daniel J. Vosotas Enterprises, LLC ("DJV Enterprises") is a Delaware limited liability company with principal place of business in Palm Beach County, Florida. On April 6, 2022 and October 27, 2022, DJV Enterprises was assigned D. Vosotas' right, title, and interest in a variety of assets including but not limited to the 50% of VOS Hospitality owned and controlled by D. Vosotas [whereas, the remainder is owned and controlled by J. Vosotas] and subsequently DJV Enterprises and its unknown assets as well as other assets of D. Vosotas on information and belief pursuant to the Schedule A omitted from production were assigned to the Family Trust where J. Vosotas is Family Trustee and Sole Beneficiary.

33.     The Portara Fund, led by Portara Capital Management, LLC, a Delaware limited liability company, and Portara Capital GP, LLC, a Delaware limited liability company, is a series of related entities, which were formed by the Debtor and his father pre-petition and which are headquarted at the Debtor's home in Coral Gables, Florida.  The Portara Fund is marketed as a "Global Luxury Villa & Short Term Rental Real Estate Fund" by D. Vosotas on his LinkedIn. The

Portara Fund's research, development and legal costs are funded by VOS Investments (an entity disclosed by the Debtor on his Initial Schedules and SOFA, but removed on his Amended Schedules and SOFA). Based upon information currently available to the Creditors, the Portara Fund and related entities is comprised of at least the following: Portara Capital Management, LLC; Portara Capital GP, LLC; Portara Hospitality LLC; Portara LLC; Portara Master Fund; and Portara Technologies Corporation (the "Portara Entities").

## IV.    GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### A.  The Debtor's Bankruptcy Case

34.    On October 3, 2023, the Debtor commenced the instant bankruptcy case with the filing of a voluntary petition under Chapter 7, Title 11 of the United States Bankruptcy Code (the "Main Case") [Main Case, D.E. 1].

35.    On October 17, 2023, the Debtor filed his initial Schedules and Statement of Finacial Affairs [Main Case, D.E. 11] (the "Initial Schedules and SOFA").

36.    The Debtor signed the Initial Schedules and SOFA under the penalty of perjury. [Main Case, D.E. 12].

37.    In the Initial Schedules and SOFA, the Debtor scheduled that:

   i.    he had no income for himself or his non-filing spouse, Carla Christina Vosotas, but did schedule that he received $5,300 per month in family support payments. *See* Initial Schedules and SOFA, at Schedule I.

   ii.    "Debtor's father gives support for mortgage, taxes and insurance" in an "unknown" amount. *See* Initial Schedules and SOFA, Schedule A/B, Item 29.

   iii.    he did *not* hold an interest in any trust, equitable or future interets in property, and rights or powers exercisable for your benefit other than a power of attorney for Bessie Joorabchi. *See* Initial Schedules and SOFA, Schedule A/B, Item 15.

   iv.    he had gross income of $0.00 since January 1, 2023; gross income of $60,749.04 for 2022; and gross income of $0.00 for 2021. *See* Initial Schedules and SOFA, at SOFA Part 2, Item 4.

     v.    he did not receive any other income during 2023 or the two previous calendar years. *See* Initial Schedules and SOFA, at SOFA Part 2, Item 5.

     vi.    he did not transfer sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of his business or financial affairs within two years pre-petition. *See* Initial Schedules and SOFA, at SOFA Part 7, Item 18.

     vii.    he did not control any property that someone else owns and that he was not holding any property in trust for someone. *See* Initial Schedules and SOFA, at SOFA Part 9, Item 23.

38.    With respect to his interest in various entities, the Debtor scheduled in his Initial Schedules and SOFA:

     i.    that within four years pre-bankruptcy, he was a member of the entities VOS Investments LLC (2/25/21 – present) and VOS Hospitality (no date provided). *See* Initial Schedules and SOFA, at SOFA part 11, item 27.

     ii.    a 50% interest in VOS Hospitality. *See* Initial Schedules and SOFA, at Schedule A/B, Item 19.

39.    The Debtor's initial 341 Meeting of Creditors was scheduled for November 7, 2023.

40.    That same morning, the Debtor filed his Amended Schedules and Statement of Financial Affairs [Main Case, D.E. 36] (the "Amended Schedules and SOFA"). The Debtor signed the Amended Schedules and SOFA under the penalty of perjury. [Main Case, D.E. 37].

41.    In the Amended Schedules and SOFA, the Debtor again scheduled that he:

     i.    had no income for himself but stated that his non-filing spouse, Carla Christina Vosotas, was self-employed as a real estate agent earning $20,000 per month. *See* Amended Schedules and SOFA, at Schedule I.

     ii.    received $5,300 per month in support payments, *see* id., and that "Debtor's father gives support for mortgage, taxes and insurance" in an "unknown" amount, *See* Amended Schedules and SOFA, Schedule A/B, Item 29.

     iii.    did not hold an interest in any trust, equitable or future interets in property, and rights or powers exercisable for your benefit other than a power of attorney for Bessie Joorabchi. *See* Amended Schedules and SOFA, Schedule A/B, Item 15.

     iv.    had gross income of $0.00 since January 1, 2023. *See* Amended Schedules and SOFA, at SOFA Part 2, Item 4.

     v.    did not receive any other income during 2023 or the two previous calendar years. *See* Amended Schedules and SOFA, at SOFA Part 2, Item 5.

     vi.    did not transfer sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of his business or financial affairs within two years pre-petition. *See* Amended Schedules and SOFA, at SOFA Part 7, Item 18.

     vii.    did not control any property that someone else owns and that he was not holding any property in trust for someone. *See* Amended Schedules and SOFA, at SOFA Part 9, Item 23.

42.    With respect to gross income, in the Amended Schedules and SOFA, the Debtor represented he earned income of $11,548.36 in 2022 and income of $60,749.04 in 2021. *See* Amended Schedules and SOFA, at SOFA Part 2, Item 4.

43.    With respect to his interest in various entities, the Debtor, in the Amended Schedules and SOFA, scheduled that:

     i.    He held an interest in VOS Hospitality, LLC (50%); VOS Manager I, LLC (50%); and Greystone Managing Member, LLC (100%). *See* Amended Schedules and SOFA, at Schedule A/B, Item 19.

     ii.    Within the four years pre-bankruptcy, he was a member of: VOS Hospitality, LLC (11/29/12 – present); Greystone Managing Member, LLC (7/1/16 – present); VOS Holdings I, LLC (11/11/2014-2022); VOS Manager I, LLC (11/11/2014-present); Whitney Managing Member, LLC (2/21 ended); DW Detroit, LLC (2/21 ended); DCW Development, LLC (2/21 ended); DHB Construction, LLC (2/21 ended). *See* Amended Schedules and SOFA, at SOFA part 11, item 27.

44.    The Debtor's 341 Meeting of Creditors was conducted and concluded on November 27, 2023 [Main Case, D.E. 41].

45.    In the 341 Meeting of Creditors, when asked if the Amended Schedules and SOFA were accurate and if any further amendments were anticipated, the Debtor testified **"this is it."**

46.     On November 17, 2023, BBM3 issued its Notice of Rule 2004 Examination Duces Tecum to the Debtor (the "2004 Notice") [Main Case, D.E. 44], which was continued by agreement. BBM3 issued an Amended Notice of Rule 2004 Examination Duces Tecum of Debtor (the "Amended 2004 Notice") [Main Case, D.E. 68] .

47.     On January 24, 2024, counsel for BBM3 conducted the Rule 2004 Examination of the Debtor (the "Debtor 2004 Exam").

48.     In response to BBM3's 2004 Notice and Amended 2004 Notice, the Debtor was materially deficient in production of documents reflecting his financial condition, assets (and transfer and disspation thereof), and business interests (and transfers thereof), has failed to adequately produce all documents in his care, custody and control, and has failed to preserve records and/or permitted destruction of the same.

49.     On May 1, 2024, BBM3 filed its *Motion to Compel Production of Documents From Debtor* [Main Case, D.E. 99]. At a hearing on May 6, 2024, the Motion was granted and the order is pending.

**B. Pre-Petition Dealings Between Creditors and Debtor – the Greystone Hotel**

**1. The Initial Inducement - Founding, Acquisition and Financing**

50.     The relationship between the Creditors and Debtor arises out of the purchase and development of two adjacent parcels of real property in Miami Beach, Florida located at 1920 Collins Avenue (the "1920 Collins Property") and 230 20th Street (the "20th Street Property") with funds provided by BBM3, which is managed by Muhl.

51.     Muhl and the Debtor met when they were students at the University of Michigan. After graduation, both Muhl and the Debtor moved to New York to work on Wall Street.

52.     Throughout his tenure on Wall Street, the Debtor frequently touted to Muhl the hotel knowledge and experience he purportedly gained from his father, D. Vosotas, whom the Debtor represented to Muhl was a successful hotelier.

53.     In 2011, the Debtor asked Muhl if he was interested in acquiring a historic property in Miami to develop the property into a hotel (the "Project").

54.     The Debtor represented to Muhl at that time that the Vosotases were unable to get traditional financing for the Project due to losses they purportedly sustained during the global financial crisis and as a result of their attendant defaults on D. Vosotas's previous hotel assets.

55.     Muhl responded that he would speak with his siblings about possibly funding the acquisition of properties for the Project through their jointly owned companies, BBM3 and BBM3 II, LLC ("BBM3 II").

56.     The Debtor represented to Muhl at that time that Muhl and/or his entities would be partners in the venture and that the Vosotases would pay the debt service on a loan, which would purportedly last only for a short period until the Vosotases could refinance through traditional lenders and other means, including the Federal Historic Preservation Tax Incentives Program, the EB-5 Program, and their personal funds. The Debtor represented to Muhl that his and his father's personal funds would be primarily sourced from hotels, which the Debtor represented the Vosotases were managing throughout the country.

57.     Also at this time, and to further induce Muhl and his entities to finance the Project, the Vosotases touted to Muhl and BBM3 the Vosotases' supposed successful development, acquisition, and management of more than 60 hospitality projects across the United States with more than $700,000,000.00 in transactions through their wholly-owned affiliate, Trans Inns. This

inducement included representations about the Vosotases' financial condition and wherewithal to enter transactions related to the Project.

58.    Consequently, Muhl and the Debtor formed Greystone Terra Firma, LLC ("Terra Firma") and Santa Barbara for the purpose of acquiring the 1920 Collins Property and the 20th Street Property, to redevelop these properties and the historic hotel that was on one of the properties into a boutique hotel (the "Greystone Hotel").

59.    On or about May 24, 2012, Greystone Terra Firma acquired the 1920 Collins Property with a loan of $5,000,000.00 from BBM3 as lender (the "Terra Firma Loan"). In addition to the Terra Firma Loan, BBM3 provided another $1,500,000.00 in equity financing, for total funding of 87% of the acquisition price.

60.    On or about January 3, 2014, Santa Barbara acquired the 20th Street Property with a loan of $5,000,000.00 from BBM3 II as lender (the "Santa Barbara Loan"). In addition to the Santa Barbara Loan, BBM3 II provided another $2,350,000.00 in equity financing, for total funding of 100% of the acquisition price, plus closing costs and other expenses.

61.    Each of the above entities' corporate and loan documents contained certain covenants, restrictions, among other obligations and commitments of the Debtor, particularly in his role as a manager.

### 2.  The Debtor's Initial Defaults to BBM3 and BBM3 II

62.    Despite his representations to, and agreements with Muhl and BBM3, the Debtor did not pay the amounts due to BBM3 on the Terra Firma Loan as or when due.

63.    On or about January 1, 2014, BBM3 served Terra Firma, through its Co-Manager, the Debtor, with a Notice of Default after failing to pay interest due under the Terra Firma Loan.

64.    Similarly, the Debtor did not pay the amounts due on the Santa Barbara Loan.

65.     On or about January 1, 2015, BBM3 II served GHM (which is the 100% owner of Santa Barbara), through its Co-Manager, the Debtor, with a Notice of Default after failing to pay interest due under the Santa Barbara Loan.

66.     Upon receiving the Notices of Default, the Debtor pleaded with Muhl, BBM3, and BBM3 II to extend the loans and to forgive the Vosotases' delays in developing the Greystone Hotel, representing that the failure to pay the required interest payments was the fault of others.

67.     To induce BBM3 and BBM3 II to amend and restate the loans, the Vosotases each executed a Guaranty on or about December 30, 2015.

68.     Additionally, the Debtor, on behalf of Terra Firma, executed an Amended and Restated Mortgage and Security Agreement.

69.     Subsequently, the Vosotases executed a December 16, 2016 Side Letter, which directly incorporated the December 30, 2015 Guaranty, to account for the closing of the QLICI Loans (defined below) that were executed on November 3, 2016.

70.     Moreover, the Vosotases, on behalf of Greystone Tenant (which entered into a Ground Lease of the 1920 Collins Property with Terra Firma as Landlord), executed an Agreement to Pay Additional Interest, pursuant to which Greystone Tenant agreed to pay additional interest directly to BBM3 with respect to the Terra Firma Loan. The Guaranty, the Amended and Restated Mortgage and Security Agreement, the Side Letter, and the Agreement to Pay Additional Interest are hereinafter collectively referred to as the "Additional Agreements."

71.     The various closing, corporate, and transactional documents associated with the above agreements contained extensive representations, warranties, and covenants – both financial and non-financial – committed to by the Debtor.

### 3.  Early Outside Tax Credit Financing

#### a.  US Bank Federal Historic Rehabilitation Tax Credit Financing (Phase I)

72.      The Greystone Hotel includes historic structures (i.e., the 1920 Collins Property), the proper rehabilitation of which qualify for federal historic rehabilitation tax credits.

73.      After the Additional Agreements were executed (with the exception of the December 16, 2016 Side Letter that was executed after the Historic Tax Credit closing to incorporate elements of that closing into the 2015 Mortgage & Guarantees signed by the Vosotases), the Debtor purported to proceed with managing the rehabilitation and construction of the 1920 Collins Property.

74.      US Bancorp Community Development Corporation ("US Bank") agreed to contribute federal historic tax credit financing to fund the rehabilitation and construction of the 1920 Collins Property.

75.      Pursuant to the transaction with US Bank, which closed on November 3, 2016, US Bank originally agreed to provide a total of approximately $6,700,000.00 in federal historic tax credit financing across the 3 phases.

76.      Greystone Tenant agreed to pass through the federal historic tax credits to GMT (which was formed for the specific purpose of obtaining the federal historic tax credits pursuant to a Master Lease of the 1920 Collins Property with Greystone Tenant) arising from the rehabilitation of the 1920 Collins Building.

77.      US Bank also agreed to acquire a 99% interest in GMT (while GMM would own a 1% interest), on the condition that Muhl and the Debtor execute various agreements on behalf of themselves and their affiliated entities.

78.    Given the amount of potential liability, US Bank also required D. Vosotas to be a guarantor in addition to the Debtor and Muhl.

79.    Consequently, on November 3, 2016, Muhl, the Debtor, and D. Vosotas executed unconditional guarantees (the "Unconditional Guarantees") for the benefit of US Bank.

80.    Muhl would never have executed the Unconditional Guarantees (or any other financing agreements involving the Vosotases) but for the Vosotases' fraudulent misrepresentations and inducements regarding their alleged finances, ability to repay, and business acumen, including as alleged above.

81.    Additionally, on November 3, 2016, US Bank and GMM entered into the Greystone Master Tenant, LLC Operating Agreement, which further memorialized the transaction.

82.    Also on November 3, 2016, BBM3 executed a $15,000,000.00 Letter of Credit in favor of US Bank to provide an additional source of backup funding for the rehabilitation of the 1920 Collins Property. This was a condition precedent for US Bank to close on the $6,700,000.00 historic tax credit investment. Indeed, US Bank would not have made the historic tax credit investment without BBM3's and Muhl's substantial additional financial commitments.

83.    To induce BBM3 to execute the Letter of Credit, the Vosotases, individually and on behalf of their affiliated entities (including but not limited to Greystone Hospitality), executed a Contribution Agreement dated November 3, 2016, a Development Services Agreement dated November 3, 2016, and an Unconditional Guaranty dated November 3, 2016, and a QLICI Payment and Completion Guaranty dated November 3, 2016.

84.    BBM3 would never have executed the Letter of Credit but for the Vosotases' fraudulent misrepresentations regarding their alleged finances, ability to repay, and business acumen, as alleged above.

85.     Additionally, BBM3 and Muhl would not have engaged in any transaction extending historic mortgages in default, providing significant additional financing commitments (over $15 million), or any other transaction with any party without the significant contractual assurances granted by the Vosotases, their affiliates, and the tax credit parties in the form of power of attorney, dilution, substitution, governance, and other important legal rights and representations.

86.     As part of the first phase of the transaction with US Bank, Octagon Credit Partners, L.P. ("Octagon") agreed to make a loan (the "Octagon Loan") to GMM—the managing member of GMT—in the original principal amount of $3,400,000.00, bearing interest at the rate of 11% per annum, to bridge the second phase of US Bank's tax credit investment which would not be available until 2018 based on the Debtor's (incorrect) projections. The Octagon Loan had a maturity date of May 2, 2018.

### b.  The 2016 Tax Credit Contribution Agreement

87.     On November 3, 2016, US Bankclosed a historic tax credit equity investment and financing transaction on the Greystone hotel entities (the "Greystone Closing").

88.     In conjunction with the Greystone Closing, a variety of documents were signed including but not limited to operating agreements, contribution agreements, unconditional guaranties, and other transaction documents.

89.     On November 3, 2016, BBM3, BBM3 II, CCG Sub-CDE 43, LLC, USBCDC 180, US Bank, Greystone Tenant, GMM, GMT, Octagon Credit Partners LP, Greystone Hospitality, Greystone Hotel Developer, LLC, Greystone Option Holder, LLC, US Bancorp Community Development Corporation ("USBCDC"), Muhl (individually), the Debtor (individually), and D. Vosotas (individually) entered into the Contribution Agreement (the "2016 Contribution Agreement").

90.     Pursuant to the terms of the 2016 Contribution Agreement, BBM3 was designated as the "Principal Sponsor" and BBM3 was granted Power of Attorney to control the capital tables and update the operating agreements in conjunction with capital contributions, including, but not limited to, the ability of BBM3 to update the operating agreement of GMM to acquire membership interest and remove or substitute members and managers.

91.     The 2016 Contribution Agreement further provides, "upon making a Required Additional Contribution by cash contribution to the QALICB, the Principal Sponsor [BBM3] may apply the amount of the Required Additional Contribution to the acquisition of additional membership interests from the Leverage Lender [Greystone Managing Member]"..

92.     Pursuant to the terms of the 2016 Contribution Agreement, any changes to the ownership and/or management of the tax credit structure affecting GMT whether directly or indirectly through GMM required the approval and signature of USBCDC.

93.     Further, pursuant Section 6 of the 2016 Contribution Agreement, US Bank maintains a variety of approval and consent rights with respect to all Greystone Hotel sponsor entities and individuals, including sponsor entities that are not a part of the tax credit structure.

94.     The GMT Operating Agreement, executed in conjunction with the Greystone Closing, provides that US Bankowns 99% of GMT, which is 1% owned by GMM.

95.     At the time of the Greystone Closing, GMM was owned 50% by Muhl and 50% by the Debtor and both the Debtor and Muhl were managers of GMM.

96.     Subsequently, as a result of a litany of defaults and bad acts, including but not limited to those set forth herein, the Debtor was removed entirely from GMM as both a member and manager pursuant to the Contribution, Pledge & Security, Forbearance, and other agreements.

### c.  QLICI New Markets Tax Credit Financing

97.     On or about November 3, 2016, CCG Sub-CDE 43 ("CCG"), as lender, and Greystone Tenant, as borrower, entered into a Loan Agreement (the "CCG Loan Agreement").

98.     Pursuant to the CCG Loan Agreement, CCG lent a total of $3,430,000.00 to Greystone Tenant, which is evidenced by two promissory notes in the amounts of $2,414,750 and $1,015,250 (collectively, the "CCG Notes").

99.     Also on or about November 3, 2016, the Debtor, D. Vosotas, and Muhl executed a Payment and Completion Guaranty in favor CCG (the "QLICI Payment and Completion Guaranty").

100.    The Vosotases were required to provide annual guarantor personal financial statements providing full reporting on all of their assets and ownership on at least an annual basis under the Tax Credit Unconditional Guarantee as well as the QLICI Payment & Completion Guarantee in addition the other agreements.

101.    However, the Vosotases stopped all annual guarantor financial reporting as of the end of the year 2019.

102.    Purusant to the terms of the QLICI Payment and Completion Guaranty, the Debtor, D. Vosotas and Muhl guaranteed the full and complete performance of the CCG Loan such that a breach of the CCG Loan Agreement triggered the guarantors' liability under the Payment and Completion Guaranty.

103.    The following constitute "Event[s] of Default" under Paragraph 8.1 of the CCG Loan Agreement and trigger liability under the QLICI Payment and Completion Guaranty:

8.1 Events of Default.

***

(i)      if Borrower [Greystone Tenant] defaults under any other indebtedness of Borrower and such default is not cured within thirty (30) days;[2]

\*\*\*

(l)      if Borrower [Greystone Tenant] shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors . . . .

(m)      if any Guarantor shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors . . . .

104.      Thus, the Debtor's liability under the QLICI Payment and Completion Guaranty would be triggered if Greystone Tenant failed to pay its debt or if the Debtor, as a guarantor, failed to pay his debts generally.

105.      After the Vosotases did not appear for the relevant closing on the NMTC Unwind Date nor make payments as required under the QLICI Payment and Completion Guaranty, the CCG Loan Agreement and the QLICI Payment and Completion Guaranty were assigned to USBCDC 180 by an Assignment and Assumption Agreement and the execution of two alonges to the CCG Notes all dated on January 31, 2023.

### 4.  The Management Agreements

106.      On October 12, 2016, the Vosotases caused GMT to enter into a Hotel and Premises Management Agreement with VOS Hospitality, pursuant to which VOS Hospitality agreed to manage and operate the 1920 Collins Property (the "1920 Collins Management Agreement").

107.      On November 7, 2017, the Vosotases caused Santa Barbara to enter into a Hotel and Premises Management Agreement with VOS Hospitality, pursuant to which VOS Hospitality agreed to manage and operate the 20th Street Property (the "20th Street Management Agreement").

---

[2] Greystone Tenant defaulted on the Construction Loan indebtedness in November 2018 as well as December 22, 2019 that was guaranteed by the Debtor, which ultimately gave rise to the NY Judgment against Debtor in January 2022.

The 1920 Collins Management Agreement and the 20th Street Management Agreement are hereinafter referred to collectively as the "Management Agreements."

### 5. Later Outside Financing- The Construction Loan and Related Agreements

108. On December 22, 2017, and in an effort to obtain additional funds to complete the construction of the Greystone Hotel, Santa Barbara and Greystone Tenant (collectively, the "Construction Loan Borrowers") entered into a loan agreement (the "Loan Agreement") with a third party, 1920 Collins Ave ML Funding LLC ("Moinian"), in the original principal amount of $36,800,000.00 (the "Construction Loan").

109. Moinian agreed to fund the Construction Loan via "Loan Advances" in accordance with the terms, and subject to the conditions imposed by, the Loan Agreement.

110. Moinian agreed to execute the Construction Loan as a result of BBM3's agreement to convert its existing mortgages, to have its Manager, Muhl, execute a personal guarantee, and to commit additional financing to the Project to complete construction.

111. Pursuant to the Construction Loan closing, the Vosotases swore to a Greystone Hospitality Certificate that indicated that they were co-Managers and 50%/50% individual members of Greystone Hospitality.

112. The Debtor now alleges in both the VOS CRE I Bankruptcy and the instant bankruptcy that the Greystone Hospitality Certificate was false and claims, that, as of 2015, VOS CRE I LLC owned 99% of Greystone Hospitality with the Debtor unable or unwilling to identify the parties involved in the unaccounted for alleged 1%.

113. BBM3 would not have agreed to convert its existing mortgages, and Muhl would not have agreed to execute the below-defined Guaranties nor commit additional financing to the

Project had they known the representations of the Debtor and D. Vosotas in the Greystone Hospitality Certificate sworn in conjunction with the Construction Loan to be false.

### a.  The Guaranties

114.    In connection with the Construction Loan, Muhl and the Vosotases also executed a Completion Guaranty, an Interest and Carry Guaranty, and a Guaranty and Recourse Obligations, all of which were dated December 22, 2017 (collectively, the "Guaranties").

115.    In the Guaranties, the Debtor, *inter alia*, guaranteed repayment of the Construction Loan if the Construction Loan went into default. Specifically, The "Guaranteed Obligations" under the Guaranties include the amounts owed on the Construction Loan.

116.    The Debtor expressly waived any right he might otherwise have to assert claims for indemnification against Holdco until the Construction Loan is paid in full. Specifically, Section 1.10 of both the Interest and Carry Guaranty and Guaranty of Recourse Obligations contained an irrevocable waiver, release and abrogation of any and all rights to seek indemnification.

117.    Section 1.14 of the Completion Guaranty includes the same language as Section 1.10 of the Interest and Carry Guaranty and Guaranty of Recourse Obligations.

118.    Further, the Guaranties, including the above waivers, are incorporated into Holdco's Operating Agreement as "Basic Documents" with which the Debtor must comply as part of his duties and obligations to Holdco.

119.    Finally, the Guaranties incorporate a Section 5.5 Prohibited Transactions in all 3 Guaranties and all reference Article V of the Recourse Obligations Guaranty, which generally preclude Guarantors from transferring assets, encumbering assets, and/or taking on additional debt without Lender consent while the Construction Loan is in default.

120.    Furthermore, Holdco's Operating Agreement required the Debtor to "not engage in any business unrelated to the purposes set forth in Section 1.3(a) [i.e., to adhere the terms of the Basic Documents, including the Loan Guarantees]" while the Loan is outstanding. Holdco's Operating Agreement at ¶5.3(d)(i).

121.    Section 5.6 of Holdco's Operating Agreement states that the "Manager shall not have the authority to do any act that is prohibited by the Act and not capable of being authorized by this Agreement." Holdco Operating Agreement, ¶5.6.

### b.  The Pledge Agreements

122.    In addition to the Guaranties, Moinian required two Pledge and Security Agreements to be executed on or about December 22, 2017 - one with Holdco and GHM (the "Holdco and GHM Pledge Agreement") and the other with GMM (the "GMM Pledge Agreement") (together, the "Pledge Agreements").

123.    Neither Holdco, GHM nor GMM would have executed the Pledge Agreements (and, consequently, neither would the Construction Loan Borrowers have been able to close on the Construction Loan) if they knew the sworn representations by the Vosotases in the Greystone Hospitality Certificate (sworn statements made in conjunction with the Construction Loan closing) to be false.

124.    The Debtor executed Pledge Agreements on behalf of Holdco, GHM, and GMM.

125.    Section 8(a) of the Pledge Agreements—titled "Rights of Lender—provides:

Notwithstanding any of the foregoing to the contrary, upon the occurrence and during the continuance of an Event of Default, Lender shall have the right to receive any and all income, cash dividends, distributions, proceeds or other property received or paid in respect of the Pledged Securities and make application thereof to the Debt, in such order Lender, in its sole discretion, may elect, in accordance with the Loan Documents. If an Event of Default shall occur and is continuing, then any or all of such Pledged Securities, at Lender's option, shall be registered in the name of Lender or its nominee (if not already so registered), and Lender or its

nominee may thereafter exercise (i) all voting, all regular membership or limited partnership, as applicable, and all other rights pertaining to such Pledged Securities . . . .

126.   The Holdco and GHM Pledge Agreement defines "Pledged Securities" to mean "the limited liability company interests of Pledgor [i.e., Holdco and GHM] in the entities listed on Schedule 1 hereto."

127.   Schedule 1 to the Holdco and GHM Pledge Agreement includes the following table, reflecting the limited liability company interests that Holdco and GHM pledged to the Lender:

| Issuer | Owner | Class of Membership Interest | Percentage of Membership Interests |
|--------|-------|------------------------------|-------------------------------------|
| Santa Barbara 230, LLC | Pledgor (GHM) | Sole member | 100% |
| Greystone Tenant, LLC | Pledgor (Holdco) | Sole member | 100% |
| Greystone Option Holder, LLC | Pledgor (Holdco) | Sole member | 100% |
| Greystone Hotel Miami, LLC | Pledgor (Holdco) | Sole owner | 100% |

128.   The GMM Pledge Agreement defines "Pledged Securities" to mean "the limited liability company interests of Pledgor [i.e., Greystone Managing Member] in the entity listed on Schedule 1 hereto."

129.   Schedule 1 to the GMM Pledge Agreement includes the following table, reflecting the limited liability interests that GMM pledged:

| Issue | Owner | Percentage of Membership Interests |
|-------|-------|-------------------------------------|
| Greystone Master Tenant, LLC | Greystone Managing Member, LLC | 1% or such larger percentage as Pledgor may acquire in accordance with the terms of the Master Tenant Company Agreement or otherwise |

**c.   The Assignment and Subordination of Management Agreements**

130.    Also on December 22, 2017, VOS Hospitality entered into Assignment and Subordination of Management Agreements with Moinian, Greystone Tenant, and Santa Barbara, wherein Greystone Tenant and Santa Barbara assigned the Management Agreements to Moinian, and VOS Hospitality agreed to subordinate the Management Agreements to the Construction Loan.

### 6.  The Holdco Contribution Agreement

131.    On or about October 29, 2018, BBM3, BBM3 II, Greystone Hospitality, Holdco, Muhl (individually), the Debtor (individually), and D. Vosotas (individually), entered into a second Contribution Agreement (the "2018 Contribution Agreement").

132.    Pursuant to the 2018 Contribution Agreement, BBM3 had the right, but not the obligation, to contribute to Holdco "additional equity as needed to fund construction and operations of the Greystone Hotel, cure construction out-of-balance amounts and operating deficits, or any other construction or operational financing needs of the Greystone Hotel (the 'Additional Contribution').".

133.    The parties also agreed in the 2018 Contribution Agreement, *inter alia*, that upon making any Additional Contribution by cash contribution to Holdco, BBM3 could cause additional membership interests to be issued by Holdco in favor of BBM3 and BBM3 II, pro-rata at minimum.

134.    The parties also agreed that membership interests in Holdco would be issued to BBM3 and BBM3 II as a matter of right and that Holdco's Operating Agreement would automatically be amended to reflect the issuance of the additional membership interests to BBM3 and BBM3 II.

135.    In addition, the parties "irrevocably" appointed BBM3 and BBM3 II as their "proxy and attorney-in-fact . . . with full power of substitution, to give all consents, waivers, and ratifications in respect of the interests in Greystone Holdco and otherwise act with respect thereto

as though it were the outright owner thereof in connection with the exercise of the rights granted"
by the 2018 Contribution Agreement.

136.    Consequently, as of October 31, 2018, Holdco was owned as follows:

| Name | Membership Interest |
|---|---|
| BBM3, LLC | 54% |
| BBM3, II, LLC | 33% |
| Greystone Hospitality, LLC | 13% |
| **Total** | 100% |

137.    The Debtor acknowledged and confirmed that Greystone Hospitality held only a
13% ownership interest in Holdco as of October 31, 2018 when he signed a revised Exhibit A to
Holdco's Operating Agreement. Further material revisions to the Holdco Operating Agreement
were coming in the future based on tens millions in additional contributions to come in the
following year.

### 7.  The 2018 Construction Loan Defaults

138.    On November 1, 2018, Moinian delivered written notice to the Debtor and Muhl
that there was a payment deficiency of at least $3,281,758.74 due to Moinian pursuant to the Loan
Agreement.

139.    BBM3 funded the deficiency, as well as several subsequent deficiencies, pursuant
to the 2016 and 2018 Contribution Agreements to prevent construction from halting and to prevent
Moinian from foreclosing.

140.    Indeed, during the 2018-2019 construction period, there were more than
$13,800,000.00 in deficiencies, which BBM3 funded by itself.

141.    In December 2018, and as a result of the deficiencies under the Construction Loan
and major construction delays, Moinian also required the Construction Loan Borrowers to unwind

a 1031 Exchange transaction before Moinian would continue making Loan Advances under the Loan Agreement, at a cost of over $7,500,000.00.

142.     Consequently, on December 31, 2018, BBM3 was required to make an Additional Contribution of $5,828,380.11 to a third party in order to close on the 1031 Exchange transaction that Moinian required for it to continue funding the construction of the Project.

143.     As a result, Greystone Hospitality's interest was further reduced to 10% at that time, resulting in the following ownership percentages of Holdco:

| Name | Membership Interest |
|------|---------------------|
| BBM3, LLC | 64% |
| BBM3, II, LLC | 26% |
| Greystone Hospitality, LLC | 10% |
| **Total** | 100% |

144.     On or about September 2020, the Debtor signed Holdco's 2019 tax return on behalf of Holdco, wherein he represented that Greystone Hospitality's interest in Holdco was reduced to 10% as of that date.

145.     Greystone Hospitality's interest in Holdco was subsequently zeroed out as a result of, among other things, its repeated failure to meet its financial obligations vis-à-vis Holdco as well as complete Debtor guarantee default and subsequent bad acts by the Debtor, Greystone Hospitality, and other related parties including an unauthorized receivership over Holdco in breach of Holdco's operating agreement (and also a further breach of the Loan, Pledge, Contribution, among other agreements).

### 8.     BBM3 Bails Out the Debtor and Saves the Hotel, Becoming Moinian's Successor-in-Interest

146.     In or around August 2019, Moinian refused to fund the Debtor's construction draws on behalf of the Construction Loan Borrowers due to J. Vosotas's failure to disclose (a) the defaults of, and issues with, the Octagon Loan, (b) an escalating legal conflict with the contractor, Turner

31

Construction ("Turner"), and (c) continued delays to the construction of the Project. This caused the development projections for the Project to slip even further into 2020.

147.    In October 2019, BBM3, US Bank, and Muhl learned for the first time from Octagon that the Debtor, purportedly on behalf of Greystone Managing Member, executed a one-year extension of the maturity date of the Octagon Loan (which had matured on May 2, 2018 and was therefore in default) at a much higher interest rate of 16% (versus the original 11%).

148.    The Debtor allowed Greystone Managing Member to default on the Octagon Loan a second time, which resulted in Octagon charging default interest, without disclosing the prior default, prior extension, or existing default to BBM3, BBM3 II, Muhl, Moinian, or US Bank.

149.    The lack of construction funding from Moinian prevented the 1920 Collins Property from obtaining a Temporary Certificate of Occupancy ("TCO") by the deadline of December 31, 2019.   Failing to meet this deadline risked the likelihood of US Bank's recapture of the $6,700,000.00 in federal historic tax credits, which in short, would be a substantial default under the applicable transactional documents, which would ultimately would have triggered multiple millions of dollars and guaranty liability for the guarantors.

150.    BBM3 was compelled to step in again to try to save the Project from foreclosure.

151.    As a result, on October 11, 2019, Moinian assigned, sold, and transferred its interest in the Loan Agreement and all corresponding loan documents and agreements (collectively, the "Construction Loan Documents") to BBM3 for $31,910,858.94, making BBM3 the successor-in-interest to Moinian.

152.    Although neither the consent of the Construction Loan Borrowers nor any other party was required for Moinian to sell or assign, or for BBM3 to purchase or acquire, the Construction Loan, the Debtor executed the General Assignment and Assumption Agreement (the

"Assignment Agreement") on behalf of the Construction Loan Borrowers, thereby consenting to the transaction.

153.    As part of the Assignment Agreement, the Debtor executed a Release of Lender on behalf of the Construction Loan Borrowers, which acknowledged the Assignment and released any existing claims that the Construction Loan Borrowers and their affiliates may have had against the Lender.

154.    The Assignment Agreement specifically assigned all of the December 22, 2017 Loan Documents, including but not limited to the Greystone Hospitality Certificate where Greystone Hospitality and the Vosotases swore that James and Daniel Vosotas were individually Managers and 50%/50% Members.

155.    The Debtor was motivated to consent to the assignment of the Construction Loan to BBM3 because: (i) it was the only way for the Construction Loan Borrowers to obtain additional funding and complete construction; (ii) it was the only way for the Project to obtain financing on an accelerated basis, which was required to prevent US Bank's recapture of the federal historic tax credits; (iii) the Vosotases could avoid more than $11,000,000.00 in guarantor liability (with respect to both the federal historic tax credit financing and the Octagon Loan); and (iv) if the deficiencies were not paid in full, Moinian was going to pursue tens of millions of dollars in guarantees against, *inter alia*, the Debtor, and foreclose on the Project.

156.    In addition to paying an assignment fee for the Construction Loan, BBM3 funded the Construction Loan Borrowers' construction Draw requests totaling $2,803,482.39 at closing, which represented the total additional construction funding that Moinian had refused to fund and which the Debtor represented to BBM3 and Muhl that the Project needed to both complete

construction and prevent imminent failure. The Debtor prepared these Draw requests and signed the accompanying sworn affidavits.

157.    By the end of 2019, BBM3 advanced an additional $1,446,514.02 pursuant to the Construction Loan on an accelerated basis to fund further construction Draw requests and accompanying affidavits signed by the Debtor. Consequently, at that time, the $36,800,000.00 Maximum Loan Amount under the Loan Agreement had been exceeded by millions of dollars.

158.    BBM3 would not have agreed to purchase the Construction Loan Documents nor make additional advances pursuant to the Construction Loan if it knew the sworn representations by the Debtor, D. Vosotas in the Greystone Hospitality Certificate (made in conjunction with the Construction Loan closing) that that they were co-managers and 50%/50% individual members of Greystone Hospitality to be false, that Greystone Hospitality was alleging at the same time to have 10%, 26%, and 50% membership interests in Holdco, or that the Debtor was at the same time alleging to have 0%, 50%, and 100% membership interests in GMM.

**9.  The Construction Loan Maturity Default – The Debtor Has No Intention to Satisfy and Lures BBM3 Deeper in the Hole**

159.    The Construction Loan matured on December 22, 2019, but the Debtor caused the Construction Loan Borrowers to default on the entire balance of the Construction Loan.

160.    Accordingly, BBM3 provided the Debtor with notice of the maturity default on December 31, 2019.

161.    The Construction Loan Borrowers and the Debtor (as guarantor) were not eligible to extend the Construction Loan due to existing defaults, never requested an extension, and did not make extension payments required under the Loan Agreement to effectuate any extension, even if they had been eligible.

162.    It was clear the Debtor had no intention to satisfy this Construction Loan at maturity.  His plan was clearly to lure BBM3 deeper into the hole.

163.    Because neither the Construction Loan Borrowers nor the Debtor as Guarantor offered *any* capital required to obtain COs for the Greystone Hotel, BBM3 demanded that the Debtor, as Guarantor, provide BBM3 with his personal financial statements to support the Debtor's requests for future funding under the Construction Loan.

### 10. The Debtor's 2019 Financial Statements

164.    The Debtor provided BBM3 with his Statement of Financial Condition dated December 28, 2019; his Estimated Sources and Uses of Cash dated December 28, 2019; and his Notes to Statement of Financial Condition dated December 28, 2019 (collectively, the "Debtor 2019 Financial Statements").

165.    The Debtor represented in the Debtor 2019 Financial Statements that there were "Member Loans" and "Fees" due to the Debtor individually from VOS CRE I, as well as individual equity in VOS CRE I and VOS Holdings I. The Member Loans and Fees due from VOS CRE I to James individually summed to $1,281,491 while VOS CRE I and VOS Holdings I equity was $8,684,200.52 together totaling almost $10,000,000.00.

166.    After providing BBM3 with the sworn, certified Debtor 2019 Financial Statements to further induce BBM3 to further lend, the Debtor submitted Draw requests to BBM3 on behalf of the Construction Loan Borrowers from January 2020 to July 2020 to purportedly obtain additional funding for construction as Protective Advances under the Loan Agreement, because the Construction Loan was in default.

167.    As a result, BBM3 funded an additional $7,750,000.00 (further exceeding the Maximum Loan Amount) as Protective Advances under the Loan Agreement.

168.    The Debtor 2019 Financial Statements contained materially false and fraudulent misrepresentations.

169.    BBM3 relied, to its detriment, upon the Debtor's fraudulent misrepresentations in the Debtor 2019 Financial Statements in advancing these additional loan funds.

170.    After giving the Construction Loan Borrowers notice of the maturity default under the Loan Agreement at the end of 2019, BBM3 also gave the Debtor several additional notices of BBM3's rights and remedies under the Loan Agreement, the Pledge Agreements, and the Guaranties in January through June of 2020.

**11. Federal Historic Rehabilitation Tax Credit Financing (Phase II)**

171.    The 1920 Collins Property finally met the requirements for closing on the second phase of US Bank's federal historic tax credit financing in the amount of $4,523,787.72 in September 2020.

172.    The second phase of federal historic tax credit financing was required to extinguish Greystone Managing Member's liability under the Octagon Loan and prevent triggering additional guarantor liability of over $11 million accruing to the Debtor, D. Vosotas, and Muhl.

173.    US Bank required the Debtor, D. Vosotas, and Muhl to execute several agreements as a condition to providing the second phase of financing for the 1920 Collins Property.

174.    On September 24, 2020, the Debtor signed a Forbearance Agreement wherein he expressly agreed that he could be removed as manager of GMM (which in turn is the managing member of GMM) and Greystone Tenant with the approval of US Bank.

175.    Also on September 24, 2020, the Debtor on behalf of GMM and US Bank entered into a Second Amendment to Operating Agreement of GMT, wherein US Bank reduced the tax

credit financing due to the delays and defaults. In addition, the Debtor, D. Vosotas, and Muhl reaffirmed the Unconditional Guaranty.

176.    In September 2020, Muhl and his affiliated entity entered into a Deposit Agreement with US Bank, pursuant to which Muhl and his affiliated entity agreed to provide US Bank with $1,950,000.00 in collateral.

177.    Only Muhl and his entity provided the $1,950,000.00 in collateral to US Bank because both J. Vosotas and D. Vosotas denied having any ability or willingness to provide any of the collateral that US Bank required to close the transaction.

178.    Muhl would not have agreed to provide the collateral without the inducement of the protections in the Forbearance Agreement, the Vosotases' reaffirmation of the Unconditional Guarantee, and the Loan Documents.

### 12. The Debtor's Bad Acts, Mismanagement, and Removal

179.    After the series of defaults, setbacks, and bailouts, including those referenced above, it became clear that the struggles of the Project and the deepening debt were not just a result of bad luck, bad timing, or other well-intentioned shortfalls.

### a. Misappropriation of Construction Loan Funds Through False Draw requests

180.    On or about November 25, 2019 (just 45 days after BBM3 purchased the Construction Loan), Turner Construction served the Construction Loan Borrowers through the Debtor with Notice of Claims totaling $1,998,222.07, alleging multiple breaches of contract.

181.    This resulted in construction delays due to the Debtor's mismanagement of the Project through his and D. Vosotas's entity, VOS Hospitality (the "Delay Claim").  The Delay Claim resulted in Turner serving a Demand for Arbitration alleging damages of $2,182,724.71.

182.    As the issues with Turner and the various loans mounted, BBM3 and Muhl discovered large financial irregularities with the draw requests and owner's affidavits that were prepared and signed by the Debtor.

183.    BBM3 also discovered draw requests and owner's affidavits prepared and signed by D.Vosotas despite him not having any authority to do so.

184.    In or around November 2019 (shortly after BBM3 acquired the Construction Loan) the Vosotases misappropriated funds predicated on their draw requests and accompanying affidavits to pay their personal American Express accounts, and possibly other bills, without BBM3's or Muhl's knowledge or consent.

185.    None of the subject American Express transactions appeared on any draw request or affidavit that either of the Vosotases submitted.

186.    Upon investigating the funding of construction draws on the Greystone Hotel and the accompanying owner's affidavits—all of which the Vosotases prepared and executed—BBM3 and Muhl discovered that the Vosotases had misappropriated hundreds of thousands, if not over one million dollars, that had been earmarked for payment to vendors related to the Project.

187.    By way of example and not limitation, on December 21, 2019, Turner submitted an invoice for $340,369.59 ("Pay App 47") to the Construction Loan Borrowers. The Debtor included Pay App 47 as a line item in his Owner's Affidavit and Requisition for Funds No. 38 to support the Construction Loan Borrowers' Requisition Letter No. 25 ("Draw 25-38"), wherein he requested a total of $1,000,768.50 from BBM3 on behalf of the Construction Loan Borrowers. However, Turner subsequently notified the Construction Loan Borrowers that Pay App 47 had not been paid, despite BBM3 having funded the draw request.

188.    On March 24, 2020, the Greystone's construction counsel Akerman advised the Debtor via email that misapplication of construction funds was criminal under Fla. Stat. 713.345 including amounts over $100,000 constituting a first degree felony.

189.    Consequently, BBM3 was forced to fund Turner's Pay App 47 a second time to avoid further claims by Turner that would cost the Project millions of dollars in additional fees and cause even more construction delays.

190.    Promptly after Debtor learned of the second funding of Turner's Pay App 47 and just days after Akerman's legal counsel advised as to the criminality associated with misapplication of these funds, the Debtor logged into the Greystone Tenant bank account and misappropriated an additional $53,297.04 in payment torwards his American Express, which likewise was not disclosed on in Draw 25-38 and attendant owner's affidavit.

191.    Even with BBM3's second funding of Pay App 47, Turner recorded a lien against the Greystone Hotel on or about May 5, 2020 for $817,997.88 as a result of the Debtor's misappropriation of funds that were supposed to be paid to Turner for its subsequent invoice.

192.    On November 10, 2020, BBM3 settled Turner's Delay Claim for $900,000.00, without any contribution from the Vosotases or any of their affiliated entities.

193.    This qualified as an Additional Contribution under the 2018 Contribution Agreement and provided BBM3 with additional equity in Holdco. Additionally, this authorized BBM3 to register the interests held by Holdco in its own name pursuant to the Pledge Agreements.

194.    After learning about the Debtor's misappropriation of the money that BBM3 had funded for the Project, BBM3 paid all subsequent draw requests by wire directly to vendors.

195.    As of that time, BBM3 no longer sent funds to the bank accounts associated with the Greystone Hotel because the Debtor controlled the bank accounts and he also wrongfully

allowed D. Vosotas to assert control over such bank accounts, while he simultaneously prevented Muhl and BBM3 from having full access to the accounts.

196.    Throughout the first half of 2020, dozens of third-party vendors emerged, all alleging non-payment for their work related to the Project and threatening to file liens related to draw requests that the Debtor prepared and signed and which BBM3 had already funded between September 2019 and January 2020.

### b. Termination of VOS Hospitality Management Agreement

197.    Due to the Vosotases' ongoing mismanagement and misappropriation of construction funds that were earmarked for certain vendors, and in accordance with the Assignment and Subordination of Management Agreements, BBM3 terminated the Management Agreements with VOS Hospitality on January 27, 2020.

198.    Despite being terminated, the Vosotases prevented VOS Hospitality from turning over control of the Project's bank accounts at Bank of America, the Greystone Hotel's booking system credentials, the M3 accounting system access, and the Hotel website (www.greystonemiamibeach.com).

### c. Removal of Debtor as Manager of GMM (and by association as a control person of GMT), Holdco, and GHM

199.    Because the Loan Agreement was in default, BBM3 had the right to register all of the Pledged Securities under the Pledge Agreements in its name and exercise all voting and all other rights pertaining to such Pledged Securities as if it were the absolute owner thereof.

200.    Accordingly, on October 15, 2020, BBM3 sent notice to J. Vosotas stating that BBM3 exercised its voting rights pursuant to the Greystone Managing Member Pledge Agreement and that it removed Greystone Managing Member as Manager of Greystone Master Tenant.

201.    On October 16, 2020, BBM3 sent a notice to J. Vosotas, stating that BBM3 had exercised its voting rights pursuant to the Holdco and GHM Pledge Agreement and removed J. Vosotas as Manager of Santa Barbara, Greystone Hotel Miami, and Greystone Tenant.

202.    On December 21, 2020, BBM3 sent notice to J. Vosotas that it had removed him as Manager of Holdco pursuant to the terms of Holdco's Operating Agreement, the 2018 Contribution Agreement, and the Holdco and GHM Pledge Agreement.

203.    As was its right, BBM3 registered the Pledged Securities (the limited liability interests in Santa Barbara, Greystone Tenant, Greystone Hotel Miami, Greystone Option Holder, and Greystone Master Tenant) in its name when it filed its 2020 tax return with the IRS.

204.    Pursuant to the terms of the agreements governing Holdco and its assets as well as applicable law and tax regulations, BBM3 also indicated on the Holdco 2020 tax return that Greystone Hospitality no longer had an interest in Holdco.

205.    In contrivance of his removal from GMM (and by association from any management authority of GMT), the Debtor drained GMT's Bank of America Account on December 31, 2020.

206.    In spite of the VOS Hospitality's termination and US Bancorp Community Development Corporation (99%) Third Amendment to the Greystone Master Tenant Operating Agreement naming SALT Hotels LLC as the replacement hotel management company for the Greystone Hotel, the Debtor sent a cease & desist to SALT Hotels LLC on July 27, 2021 on VOS Hospitality letterhead meanwhile purporting to be acting in his capacity as Manager of GMM, GMT, Greystone Tenant, Santa Barbara, and Holdco (all of which the Debtor knew he had been removed from pursuant to uncontested notices in addition to the VOS Hospitality termination almost 18 months prior).

### d. A Parting Gift – The Debtor Solicits Third Party Litigation Against the Greystone Hotel

207.    After termination of the VOS Hospitality Management Agreement, the Debtor sent emails from james.vosotas@greystonemiamibeach.com, james.vosotas@voshospitality.com, and even from @greystonemiamibeach.com accounts in the names of former employees long after their departures encouraging third parties to sue and take other action against the Creditors, including the Greystone Hotel.

208.    These efforts by the Debtor resulted in third party litigation claims brought against certain Greystone Hotel entities, ironically even including an entity the Debtor now claims to 100% own (Greystone Managing Member) and 100% control (Greystone Master Tenant vis a vis Greystone Managing Member) on his Amended Schedules & SOFA.

### 13. All the While and Concealed - Formation of VOS CRE I, LLC to Secretly Solicit "Investments" and Subsequent Investor Litigation

209.    Unbeknownst to the Creditors, the Vosotases secretly formed VOS CRE I, LLC ("VOS CRE I") in 2014 to solicit millions of dollars from unwitting third party "investors."

210.    The Debtor and D. Vosotas undertook these actions in their personal capacities and for VOS Holdings I, VOS Manager I, VOS Hospitality, Greystone Hospitality and Trans Inns.

211.    D. Vosotas also took these actions as trustee of the DJV Trust.

212.    The Debtor, with the aid and assistance of D. Vosotas, created and distributed a Confidential Private Placement Memorandum of VOS CRE I (the "VOS CRE PPM") dated January 15, 2015 to solicit more than $6,000,000.00 in "investments," falsely representing that VOS CRE I held a 50% ownership interest in three real estate assets: (1) the Greystone Hotel in Miami; (2) the David Whitney Building in Detroit; and (3) the Rockwell Place in Brooklyn.

213.    The VOS CRE PPM, which was prepared by the Debtor and D. Vosotas, expressly states that VOS Holdings, VOS Manager I, VOS Hospitality and Trans Inns were involved in the alleged investment opportunity and touts the alleged success of these entities.

214.    The Vosotases perpetrated this fraudulent scheme in their invidivual capacities and on behalf of VOS Holdings, VOS Manager I, VOS Hospitality, Greystone Hospitality and Trans Inns, which are controlled by the Vosotases.

215.    Upon information and belief, from approximately 2014 through 2022, both the Debtor and D. Vosotas orally repeated the same misrepresentations contained in the VOS CRE PPM, including the alleged involvement of VOS Holdings, VOS Manager I, VOS Hospitality in the fraudulent investment "opportunity" to investors.

216.    Without Muhl's, BBM3's or BBM3 II's knowledge or consent, the VOS CRE PPM not only used assets and marks relating to the Greystone Hotel, but also Muhl's family name for the purpose of inducing third parties to invest in VOS CRE I, an entity that never had any affiliation whatsoever with the Greystone Hotel, BBM3, BBM3 II, Muhl, or Muhl's family.

217.    The Vosotases did not have the authority to sell any interest in the Greystone Hotel without the express written consent of BBM3, BBM3 II, and Muhl, which consent the Vosotases never sought or obtained.

218.    Muhl, BBM3, and BBM3 II did not discover until years later that the Vosotases created VOS CRE I to defraud third parties by selling fake ownership interests in real estate assets, including the Greystone Hotel, without the knowledge or consent of any of the real estate asset owners, various tax credit parties, lenders, or requisite LLC Managers/Co-Managers, including BBM3 and Muhl.

219.    Ultimately, the Vosotases fraudulently sold these membership interests to 48 investor victims without required approvals, which resulted in litigation. *See Pappas et al vs Vosotas et al*, Case Number 2021-185649-CB, Circuit Court for the County of Oakland, State of Michigan (the "Michigan Investor Litigation").

220.    After the VOS CRE Investors contributed millions of dollars in exchange for their interests in VOS CRE I, the Vosotases informed the VOS CRE Investors that the co-owners of the David Whitney Building—the Roxbury Group (or entities associated therewith)—took the position that the transfer of equity interests from the Vosotases and their entity DW Detroit, LLC ("DW Detroit") in the David Whitney Building to VOS CRE I was unlawful.

221.    Consequently, the Vosotases and their entities entered into "swap agreements" purportedly to reverse the Vosotases' and DW Detroit's transfer of their equity in the David Whitney Building and its affiliated entities, maintaining those interests in their individual names.

222.    During the Michigan Investor Litigation, the Roxbury Group contacted BBM3 and Muhl and subpoenaed them for documents relating to their dealings with the Vosotases.

223.    The Roxbury Group informed BBM3 and Muhl at that time that the unlawful transfers of equity that the VOS CRE Investors had uncovered in 2015 and 2016 also involved the Greystone Hotel.

224.    Around the same time, Muhl began receiving telephone calls from VOS CRE Investors who claimed they were "owners" of the Greystone Hotel and who demanded that Muhl provide them with certificates evidencing their ownership interests. Muhl had never met with, spoken to, or heard of any of these alleged investors before.

225.    In mid-2020, the Roxbury Group sought to terminate VOS Hospitality's management agreement for the David Whitney Building, which prompted arbitration proceedings

between the Vosotases' entities, VOS Hospitality, and DW Detroit on the one hand, and the Roxbury Group on the other hand.

226.    The parties to the arbitration settled their dispute and entered into a settlement agreement on January 5, 2021. Pursuant to the settlement agreement, and in exchange for at least $8,500,000.00, the Roxbury Group bought out the remaining term of VOS Hospitality's management agreement, as well as DW Detroit's ownership interest in the David Whitney Building to the Roxbury Group, and the parties separated from one another with a mutual release.

227.    Notably, the Debtor had a 50% membership interest in both VOS Hospitality and DW Detroit both of which are also confirmed by the Debtor on the Amended Schedules and SOFA.

228.    In the Michigan Investor Litigation, the VOS CRE Investors sought to enjoin the sale of their interest in the David Whitney Building, especially because the Vosotases reserved for themselves the right to "allocate" the $8,500,000.00 among the receiving parties in the Vosotases' sole discretion.

229.    There was a clearly intent by the Vosotases to "allocate" the David Whitney Building sale proceeds to entities other than the seller entities to the detriment of the Creditors and the VOS CRE investors.

230.    On February 10, 2021, the Michigan Court entered a preliminary injunction requiring the $8,500,000.00 proceeds from the sale of the interest in the David Whitney Building to be placed into escrow and out of the Vosotases' control.

231.    During the Michigan Investor Litigation, the February 2021 Expert Report of Rodney L. Crawford, CPA, CFF, ABV, CFE, CIRA contained, *inter alia*, evidence with evidence of a variety of activities by the Debtor, and his father D. Vosotas, individually embezzling approximately $6M dollars of investor funds.

232.    The Vosotases repeatedly tried to overturn the Michigan Court's ruling and access the $8,500,000.00 proceeds—including by filing multiple motions to modify or dissolve the injunction, filing an application for leave with the Michigan Court of Appeal, and having their attorney claim entitlement to the proceeds to satisfy an alleged "attorney lien"—all of which failed.

233.    In rejecting the Vosotases' attempts, the Michigan Court held that "there is little doubt that if the escrow is not maintained the [Vosotases] will spend most – if not all – the money."

### C.  The Fallout, Litigation, and the Debtor's Fraud and Malicious Acts

#### 1.  No Good Deed Goes Unpunished – The Debtor's Messes Become the Creditors' Headaches

##### a.  EB-5 Investors File Suit

234.    On or about October 8, 2019—just 3 days before the scheduled closing date for BBM3 to acquire the Construction Loan from Moinian and to fund Loan Advances that Moinian had refused to fund since August 2019—a group of EB-5 investors (the "EB-5 Investors") filed a Complaint against various Greystone entities, the Debtor, D. Vosotas, VOS CRE I, VOS Hospitality, Trans Inns, Muhl, BBM3, BBM3 II and others in a case styled *Feng et al. v. Joseph Walsh et al.*, Case No. 1:19-cv-24318-DPG, in and for the United States District Court for the Southern District of Florida (the "EB-5 Action").

235.    Muhl, BBM3, and BBM3 II did not become aware of the EB-5 Action until October 29, 2019, after the date that the Assignment Agreement was closed on October 11, 2019.

236.    Unbeknownst to Muhl and BBM3 at the time, the EB-5 Action arose as a result of a fraudulent scheme by the Vosotases (personally and for various entities, Joseph J. Walsh, Sr. ("Walsh"), and his affiliated entities to induce the EB-5 Investors to invest in the Project so they could obtain visas pursuant to the EB-5 Immigrant Investor Program (the "EB-5 Program").

237.    In 2010, Walsh applied for and received approval for the creation of an EB-5 Regional Center—which Walsh named South Atlantic Regional Center, LLC ("SARC")—and which encompassed Palm Beach County, Broward County, and Miami-Dade County.

238.    On or about June 23, 2014, the Debtor, with the involvement and assistance of D. Vosotas, and Walsh formed Greystone EB-5, LLLP ("Greystone EB-5 Partnership")—an entity that has no actual affiliation with the Greystone Hotel, BBM3, BBM3 II or Muhl—for purposes of fraudulently soliciting investments in the Project from foreign investors.

239.    According to Sunbiz, two general partners managed the Greystone EB-5 Partnership: SARC (which Walsh managed and controlled) and United EB-5, LLC (which the Debtor managed and controlled with the involvement and assistance of D. Vosotas).

240.    On or about July 30, 2014, Greystone EB-5 Partnership offered to sell purported limited partner units in the Greystone EB-5 Partnership to EB-5 Investors for $500,000 per unit.

241.    The Vosotases and Walsh provided the EB-5 Investors with a purported investment portfolio (the "Investment Portfolio") in connection with the supposed investments in the Greystone EB-5 Partnership, which contained, *inter alia*, contained a Greystone EB-5 LLLP Private Placement Memorandum ("EB-5 PPM") that touted the alleged success and involvement of VOS Hospitality and Trans Inns and additionally profiles the Debtor & D. Vosotas as the management of the Greystone Hotel.

242.    The EB-5 PPM identifies the Vosotases, along with their affiliates, Trans Inns and VOS Hospitality, as the sponsors, developers, and managers of the Project. Indeed, the Debtor and D. Vosotas were acting in their personal capacities and on behalf of VOS Hospitality and Trans Inns in preparing and marketing the fraudulent EB-5 PPM.  Neither BBM3 nor Muhl are mentioned in the EB-5 PPM.

243.    Contrary to the Vosotases' false representations in the 2015 EB-5 PPM, D. Vosotas had no management authority over, nor any ownership interest in, any of the Greystone entities except Greystone Hospitality, LLC (which was only a member of GHM at that time as Holdco did not yet exist until December 22, 2017).

244.    Similarly, Trans Inns had no contract nor other relationship with any of the Greystone entities.  Neither did VOS Hospitality when the EB-5 PPM was prepared.

245.    Moreover, neither D. Vosotas nor Trans Inns were authorized to handle any of the funds associated with the Greystone Hotel.

246.    In spite of this, the Debtor assisted D. Vosotas, Trans Inns, and Trans Inns' Chief Financial Officer Robert Negron at the time in handling and misappropriating $500,000 in EB-5 related funds wired to them by South Atlantic Regional Center (SARC).

247.    Furthermore, the Debtor had no authority to enter into a purported loan agreement with the Greystone EB-5 Partnership or to receive funds under GHM's Operating Agreement without unanimous consent of the Managers, which included Muhl. The Debtor never sought or obtained the necessary consents.

248.    Contrary to the Vosotases' misrepresentations in the EB-5 PPM, GHM was not the owner of the Greystone Hotel nor was it responsible for developing the Greystone Hotel. The Debtor perpetuated this false misrepresentation in an August 15, 2015 letter to an EB-5 Investor, which resulted in yet another investor complaint against the Vosotases in June 2022.

**b.  Turner Construction and Other Construction Vendor Claims**

249.    As discussed hereinabove, the Vosotases executed false draw requests and pay applications earmarked for payments of certain vendors.

250.     Turner Construction and others imposed liens, commenced litigation, delayed construction, all as a result of the Debtor's misuse and misappropriation of the earmarked funds.

251.     This caused BBM3 and others of the Creditors additional time, expense, and damage to contend with.

### c.  Preferred Hotel Group Commences Litigation at Debtor's Behest

252.     The Debtor actively assisted Preferred Hotel Group ("PHG"), an adverse litigant to GMT, during 2022 and 2023 in PHG's litigation against GMT and non-legal entity Greystone Miami Beach (nomenclature that PHG obtained from the Debtor's custody, control, and usage of the email domain @greystonemiamibeach.com as alleged above).

253.     Because GMM is the managing member of GMT, any member or manager of GMM would have, among other things, a fiduciary duty to defend Greystone Master Tenant against any claims brought against it by any adverse party, including PHG.

254.     Shockingly, litigation was initiated by PHG against Greystone Master Tenant with active assistance from the Debtor. The Debtor offered assistance by contacting PHG on June 24, 2022 prior to the filing of the lawsuit and by e-mailing PHG on March 20, 2023 offering his assistance to PHG after the lawsuit was filed.

### d.  SARC Bankruptcy Estate

255.     Additionally, the Debtor was in receipt of a July 30, 2021 demand letter and the threat of litigation from SARC Chapter 7 Bankruptcy Trustee Scott Brown regarding an asserted fraudulent that in actuality did not inure to benefit to the any of the Creditors, but rather to the benefit of the Vosotases, resulted in adversary litigation against GHM, causing it to have to settle asserted claims at its expense.

### e.  Michigan Investor Litigation

256.    As described more fully above, as a result of the Debtor's actions, Muhl and BBM3 were forced to deal with completely unknown concealed parties coming out of the woodwork asserting interests in the Project, deal with responding to discovery in the Michigan Investor Litigation, all regarding dealings that were completely concealed to them.

### f.  Malicious Sunbiz Filings

257.    On or about February 2022, the Debtor – without any basis or authorization, and long after his removal as manager – commandeered the Florida Division of Corporations (Sunbiz) filings of several Greystone-related entities in an apparent attempt to harass and intentionally interfere with the business operations of the entities. By way of example and not limitation, the Debtor unilaterally submitted filings on behalf of GMT, GMM, Holdco, Santa Barbara, GHM, and Terra Firma to change the principal and mailing address for each entity to that of his father's home address. The respective entities incurred fees and costs in rectifying the Sunbiz filings.

### 2.  Fallout Litigation Between the Creditors and the Vosotases

### a.  BBM3's Judgments Against the Debtor and Enforcement Efforts

#### 1.  The New York Action and Judgment
*BBM3, LLC v. Vosotas*, Index No. 652015/2021, Supreme Court of the State of New York, County of New York, captioned (the "New York Action")

258.    On March 26, 2021, BBM3 filed the New York Action against the Debtor to enforce the terms of the Interest and Carry Guaranty and the Completion Guaranty.

259.    On January 13, 2022, BBM3 obtained a judgment against the Debtor in the principal amount of $19,380,644.30, plus post-judgment interest, in the Supreme Court of the State of New York, County of New York (the "NY Judgment").

260.    The NY Judgment remains unpaid and unsatisfied.

## 2. *Judgement Enforcement Efforts in Michigan*

261.    On July 26, 2022, BBM3 conducted a Creditor's Examination of the Debtor in Michigan (the "MI Creditor's Exam").

262.    The Debtor appeared for the MI Creditor's Exam on a phone from a car while traveling in Greece with multi-month vacation plans extending to the south of France and other European countries in the summer of 2022.

263.    Several representations made by the Debtor in MI Creditor's Exam are inconsistent with affidavits, declarations, and other sworn statements that were presented in a variety of courts after his MI Creditor's Exam, including but not limited to this bankruptcy and the associated Initial and Amended Schedules and SOFA and Rule 2004 examinations.

264.    Using a single simple example, the Debtor testified to the list of every entity that he owns and his membership interest in it in the MI Creditor's Exam. Greystone Managing Member was not on the list. The Debtor subsequently responded to sworn Interrogatories in the year after the MI Creditor's Exam in writing during Judgement Enforcement proceedings. Greystone Managing Member never appeared in any of the written, sworn Interrogatory responses. Greystone Managing Member also did not appear on the Debtor's Initial Schedules and SOFA. On his Amended Schedules and SOFA, Greystone Managing Member appeared with the Debtor alleging a 100% membership interest, which was conveniently alleged to be forgotten by the Debtor in a variety of sworn statements for almost 2 years of Judgement Enforcement proceedings proceeding this bankruptcy

### 3. *Judgment Enforcement Actions In Florida and FL Judgment*

265.    BBM3 recorded the NY Judgment in Miami-Dade County, Florida for domestication and enforcement, initiating Case No. 2022-002065-CA-01 in Miami-Dade County, Florida (the "Judgment Enforcement Action").

266.    On March 7, 2022, after the Debtor received notice of the Judgment Enforcement Action, the Debtor filed a Petition for Stay of Enforcement in a matter styled as *James Vosotas v. BBM3, LLC*, Case No. 2022-004299-CA-01 in Miami-Dade County, Florida, in connection with which the Debtor recorded a wrongful Lis Pendens in Florida against BBM3, LLC for the sole purpose of delaying enforcement of the Judgment.

267.    The Debtor failed and refused to post any bond, in any jurisdiction, and consequenetly, on April 23, 2022, the Florida Circuit Court entered an Order granting BBM3's motion to dismiss the Petition for Stay of Enforcement and to dissolve the Lis Pendens, and subsequently ordered that BBM3 is entitled to recover its attorneys' fees and costs from the Debtor.

268.    Subsequently, on September 2, 2022, BBM3 obtained an additional judgment against the Debtor in the principal amount of 28,797.00, representing BBM3's fees and costs in connection with the Peition to Stay and wrongful Lis Pendens (the "FL Judgment"). On September 8, 2022, in connection with the FL Judgment, BBM3 duly recorded a Judgment Lien Certficiate bearing file number J22000427502.

269.    The FL Judgment also remains unpaid and unsatisfied.

270.    The FL Judgment against the Debtor is undisclosed anywhere on his Initial or Amended Schedules & SOFA.

271.     In the Judgment Enforcement Action, BBM3 obtained charging orders against the Debtor's interests in *inter alia*, VOS CRE I, LLC, VOS Hospitality, LLC, VOS Manager I, LLC, and VOS Holdings I, LLC.

272.     Despite BBM3's year-and-a-half long effort to obtain basic post-judgment discovery from the Debtor, the Debtor disregarded or was woefully deficient in responding.

273.     In fact, the Debtor's bankruptcy petition was filed just days after the Debtor was in default of his obligations to respond to BBM3's *Motion (1) to Compel Discovery from Judgment Debtor; (2) to Provide Completed Form 1.977 Fact Information Sheet and Produce all Documents; and (3) for the Imposition of Sanctions*.

> **b.   *The Derivative Action***
> *Greystone Hospitality, LLC, derivatively on behalf of Greystone Holdco, LLC v. BBM3, LLC and Branden Muhl, as manager of Greystone Holdco, LLC*, Case No. 2021-016770, Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida (the "Derivative Action")

274.     On July 7, 2021, the Debtor, Greystone Hospitality (as a member, derivatively on behalf of Holdco), Trans Inn, and VOS Hospitality, LLC sued Muhl, BBM3 and BBM3 II, LLC as members of Greystone Holdco, LLC, and Greystone Tenant, Santa Barbara, and Greystone Master Tenant in the above-referenced Derivative Action.

275.     At the outset of the Derivative Action, the Debtor executed sworn declarations on behalf of Greystone Hospitality, improperly seeking appointment of a receiver and asserting that (1) "I have ownership in and manage Greystone Hospitality, LLC" including a chart reflecting direct ownership in same and (2)  Greystone Hospitality's interest in Holdco was 50%.

276.     On August 10, 2021, the Debtor successfully obtained an *ex parte* receiver over the Greystone Hotel using a sworn declaration.

277.    Thereafter, pursuant to court order, not only was the receiver converted to a monitor and subsequently dismissed as improper, but the Debtor's affiliate Greystone Hospitality was ordered to pay the fees of the receiver/monitor.

278.    Following the failure of the receivership and a ruling by the court that such was improper, the Debtor obtained new counsel at Mark Migdal Hayden LLC who amended the complaint on March 8, 2022 to drop all original party plaintiffs (including the Debtor) except sole plaintiff, Greystone Hospitality with alleged claims derivatively on behalf of Holdco against BBM3, and Branden Muhl as a manager of Holdco, for alleged breaches of fiduciary duty, contract, and implied covenant of good faith.

279.    On July 24, 2022, and as amended subsequently, BBM3 and Muhl, along with additional party plaintiffs GHM, Greystone Tenant, Santa Barbara, GMM, and GMT asserted counterclaims against Greystone Hospitality, LLC, the Debtor, D. Vosotas, both individually and as Trustee of the DJV Trust, VOS Hospitality, Trans Inns, VOS Holdings I, and VOS Manager I, regarding the Vosotases and their respective entities' mismanagement, breaches of contracts, breaches of fiduciary duties, tortious interference, civil conspiracy, among other claims.

280.    The Debtor directed the appointment of a receiver over Holdco in violation of several provisions of the Holdco Operating Agreement. By way of example and not limitation, Section 5.3(c) of the Holdco Operating Agreement provides:

> Notwithstanding any other provision of this Agreement or in any other document governing the formation, management or operation of the Company, the Members, the Manager, any Officer or any other Person, neither the Member nor the Manager, nor any Officers nor any other Person shall, so long as any Obligation is outstanding, be authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Members and the Manager to take any Material Action.

281. The Debtor obtained the receiver over Holdco *ex parte*, without the required unanimous consent from BBM3 as a member of Holdco, and without consent from BBM3 as lender and/or pledgee.

### c. *The Indemnification Action*
*James Vosotas v. Greystone Holdco, LLC*, Case No. 2022-002022-CA-01, Circuit Court for the 11th Judicial Circuit, Miami Dade County, Florida

282. Following the entry of the NY Judgment, and despite BBM3 having properly removed the Debtor as Manager of Holdco, the Debtor sued Holdco on February 2, 2022 in the Indemnification Action, seeking to have Holdco indemnify him for the NY Judgment and for all liabilities the Debtor allegedly incurred in connection with the EB-5 Action.

283. The Debtor filed the Indeminication Action against Holdco in direct contravention of his waiver of such right in Section 1.10 of both the Interest and Carry Guaranty and Guaranty of Recourse Obligations, and in Section 1.14 of the Completion Guaranty.

284. Further, by filing the Indemnification Action, the Debtor did so in direct contravention and violation of Sections 1.3(a), 5.3, 5.5 and 5.6 of the Holdco Operating Agreement. By way of example and not limitation:

    i. Section 5.5(a) requires the Debtor to have signed the Loan Guarantees as a Manager of Holdco in order to be entitled to Indemnification. The Loan Guarantees are clear that the Debtor signed them as an individual, as is the NY Judgement was entered against the Debtor individually.

    ii. Section 5.5(b) of the Holdco Operating Agreement provides, "In the event of any action by a Member or Interest Holder against the Manager, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Manager, including attorneys' fees, incurred in the defense

of such action, if the Manager is successful in such action." Holdco Operating Agreement, ¶5.5(b). Even if the Debtor had signed the Loan Guarantees as a Manager of Holdco – which he did not - the Debtor would have been required to be successful in the action. As the entry of the NY Judgement against the Debtor clearly illustrates, the Debtor was not successful in the action.

iii.    Section 5.5(f) of Holdco's Operating Agreement provides that "[f]or so long as any Obligation remains outstanding, any indemnification set forth in the Agreement shall be fully subordinate to the Obligations and, to the fullest extent permitted by law, shall not constitute a claim against the Company in the event that the Company's cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation." Holdco Operating Agreement, ¶5.5(f). In pleadings filed in the Indemnification, the Debtor admitted that not only does Holdco not have cash flow but it also does not have a bank account; therefore, there is no claim for indemnification.

iv.    In denying the Debtor's Motion for Summary Judgement in the Indemnification Case, Judge Walsh found that even if the Debtor had clean hands and none of the sections of Holdco's Operating Agreement cited above existed, the Debtor would have had to pay the NY Judgement and the Obligation (the full Loan) in their entirety before a claim could be ripe for Indemnification.

v.    A Motion for Sanctions pursuant to Fla. Stat 57.105 is pending.

d.  **_QLICI Guaranty Action_**
        _USBDC Investment Fund 180, LLC v. Daniel Vosotas_, Case No. 1:23-cv-21887-KMM, United States District Court for the Southern District of Florida (the "QLICI Guaranty Action")

285.    On or about May 19, 2023, USBCDC 180 filed a complaint against D. Vosotas to enforce its rights under a defaulted Payment and Completion Guaranty, which was executed by D. Vosotas in connection with the funding of the Hotel project, initiating the QLICI Guaranty Action.

286.    D. Vosotas filed a Motion to Dismiss for lack of subject matter jurisdiction based on diversity, arguing that the Debtor held a 50% membership interest in GMM, and relying upon a false, sworn declaration from the Debtor (the "Debtor's GMM Declaration") wherein the Debtor represented that he was a member of GMM. The Debtor's GMM Declaration referenced and attached a 2018 GMM Operating Agreement that referenced the same 50% membership interest his father plead.

287.    The court dismissed USBCDC's First Amended Complaint without prejudice, based upon its perceived lack of subject matter jurisdiction and did not reach the underlying merits.

288.    While the Debtor swore to the Debtor's GMM Declaration merely ten weeks before the Petition Date, the Debtor made no mention whatsoever of any current or prior ownership interest in GMM *anywhere* in his Initial Schedules and SOFA [Main Case, D.E 11].

289.    The Debtor's Initial Schedules and SOFA are consistent with his interrogatory responses in the Judgment Enforcement Action, where - through sworn attestations made on June 27, 2023 (just weeks prior to the Debtor's GMM Declaration) – the Debtor did not list *any* interest in GMM.

290.    On October 30, 2023, in the QLICI Guaranty Action, USBCDC filed a *Motion for Reconsideration and to Vacate Order Granting Defendant's Motion to Dismiss* pursuant to Fed. R. Civ. P. 60 (the "QLICI Rule 60 Motion"), citing, *inter alia*, the new evidence of the Initial Schedules and SOFA [QLICI Guaranty Action, D.E. 31].

291.    Just eight days after the filing of the QLICI Rule 60 Motion, and in direct response to the same, the Debtor, in the present bankruptcy, filed his Amended Schedules and SOFA [Main Case, D.E. 36] on November 7, 2023, in which the Debtor claimed – *for the first time ever* – a 100% ownership interest in GMM.

### 3. VOS CRE I Bankruptcy
*In re VOS CRE I, LLC*, Case No. 21-21082-EPK, in the US Bankruptcy Court for the Southern District of Florida

292.    On November 22, 2021, the Vosotases commenced the bankruptcy of VOS CRE I under Chapter 11, Subchapter V ("VOS CRE Bankruptcy").

293.    At the time, the Vosotases and VOS CRE - an entity previously unknown and undisclosed to the Creditors – was embroiled in litigation with investors in Michigan, after *inter alia* selling illusory interests in the Greystone Hotel project without authority, let alone disclosure.

294.    Prior to the VOS CRE Bankruptcy, the Vosotases equally owned a combined 60% of VOS CRE through VOS Holdings I, LLC. *See* First Amended Plan [VOS CRE Bankruptcy, D.E. 150]. Daniel later allegedly acquired approximately 20% in additional membership interest through the DJV Trust[3]. *Id*. VOS Holdings I was also a substantial creditor of VOS CRE. *Id.*

295.    Through the NY Judgment, BBM3 held a charging order on the Debtor's interests in both VOS CRE I and VOS Holdings I, LLC.

---

[3]  DJV Trust's acquisition of additional VOS CRE I membership interest has been subject to review and expert scrutiny in several pieces of litigation. The source of the Trust's funding of VOS CRE is subject to ongoing investigation. Daniel's Trust allegedly contributed approximately $635,000 to VOS CRE for equity, nearly all of which was within the 9 months preceding the VOS CRE Bankruptcy ($300,000 in February 2021 and approx. $275,000 in November 2021).

However, in the Michigan Investor Litigation preceding the VOS CRE bankruptcy, the Expert Report of Rodney L. Crawford, CPA, CFF, ABV, CFE, CIRA opined that D. Vosotas's February 2021 "contribution" was predicated on a baseless capital call, which in turn was summarily redistributed to the same account belonging to D. Vosotas for legal fees that were either not-yet incurred, "prepaid" and/or were unrelated to VOS CRE I but rather for other litigation, such as his defense of personal guarantee litigation.

296.    The VOS CRE I Bankruptcy occurred substantially concurrently with the Derivative Action.  However, in the disclosures, plans, and supporting sworn declarations by James, the Debtor swore that Greystone Hospitality's interest in Holdco was 26%.

297.    At this point, within approximately one year span, the Debtor made entirely different and conflicting sworn statements about Greystone Hospitality's ownership in Holdco to (a) the Internal Revenue Service (10%), (b) the Miami-Dade Complex Business Division (50%), and (c) the Florida Bankruptcy Court (26%).

298.    Setting aside the fact that that the Debtor perjured himself before at least one court and/or the IRS, the VOS CRE I bankruptcy case proceeded.

299.    The VOS CRE I bankruptcy presented two plans of reorganization within approximately 3 months of one another, providing for insider debt and equity as follows:

| | **February 2022 - Initial Plan** | **May 2022 – Amended Plan** |
|---|---|---|
| Debt | **Insider Claim VOS Holdings** – To the extent any Claim in this Class is Allowed it shall be paid 95% of the Allowed Amount. <br><br> **Insider claims of Trans Inns Management, Inc.** To the extent any Claim in this Class is Allowed it shall be paid $1,857,979. However, if all of Class 5 agrees to the Redemption Option, the Claimant will waive any distribution on this Claim, which will create an additional $482,934.60 for Class 5 and the Allowed Claim shall be converted to equity in the Reorganized Debtor. | **Insider Claim VOS Holdings** – This Claim shall be paid $25,000.00 in full satisfaction of its claim against the Debtor. <br><br> **Insider claims of Trans Inns Management, Inc.** This claim shall be paid $5,000.00 in full satisfaction of its claims against the Debtor. |
| Equity | **VOS Holdings LLC *and* D. Vosotas** Shall receive equity interest in the post confirmation Debtor upon the Effective Date consistent with the recalculated | **VOS Holdings** – Shall receive a payment of $15,000.00 in return for the extinguishment of its claims and interests in the Debtor |

| | capitalization of the post confirmation Debtor and any distribution provided for after payment of all Claims | **Daniel J. Vosotas Trust D/A/O Feb. 2, 1996 or its assignee**<br><br>Shall receive all the equity interests in the Debtor.<br><br>[Post-Confirmation Value of Equity in Excess of $4 million] |
|---|---|---|

300.    Why would there be such a dramatic swing from the Debtor and his father's previously equitable participation in the VOS CRE reorganization?

301.    3 things happened.

    a.    BBM3's judgment was domesticated in Florida and the Debtor's litigation attempt to stay the judgment failed. BBM3 likewise got charging liens on the Debtor's interest in *inter alia* VOS Holdings – the entity through which the Debtor owned a significant interest in VOS CRE.

    b.    VOS CRE successfully sustained objections to all claims except its pre-petition professionals.

    c.    VOS CRE, the Vosotases, and related entities, entered a settlement that resulted in $5.25 million coming into the VOS CRE estate.[4]

302.    In short, the Debtor knew that he was going to come into significant money that would be exposed to creditor recovery.[5]

---

[4] Oddly enough, the settlement derived from the sale of property owned by entities that were not VOS CRE but were *other* entities where James held a membership interest and are still listed on his Schedules & SOFA (DW Detroit LLC & Whitney Managing Member LLC). VOS CRE only received the net proceeds after passing over the Debtor's 50% membership interests in non-parties DW Detroit LLC & Whitney Managing Member LLC.

[5] In fact, the Debtor used the VOS CRE Bankruptcy as an opportunity to frustrate BBM3's judgment collection efforts against the Debtor invidually, by using his control of VOS CRE to cause the filing of the adversary proceeding styled as *VOS CRE I, LLC v. BBM3, LLC and Branden Muhl*, Adv. Case 20-

303.    And while the Debtor here and his father had substantially similar interests in and to VOS CRE before its bankruptcy, James exited with *de minimis* funds and cleansed of a multimillion dollar charging order, while Dan walked away with 100% equity interest in VOS CRE a "clean balance sheet" and $4,450,792 in cash after payment of allowed creditors – a 700% return within 18 months. *Id*.

304.    Meanwhile, emails produced by Debtor's former accountant include the Debtor's eager inquiry into realizing his "net operating loss" from the VOS CRE Bankruptcy and continuing to take VOS CRE business-related deductions on his personal tax returns for his wife to utilize.

305.    Now in *this* bankruptcy, VOS CRE I paid at least $30,500.00 to date to Debtor's counsel[6] for the Debtor's filing (excluding adversaries and contested matters). *See* Disclosure of Compensation [Main Case, DE 5].

### 4.    A Father's and Son's Efforts to Evade Creditors, the Debtor's Sham Dissipation of Assets and Income, and Father's Subsequent "Support" of the Debtor

306.    D.Vosotas touted himself (and was touted by the Debtor) as an experienced real-estate developer with more than 40 years of experience in the hotel industry.

307.    D. Vosotas was active (often without authority) in the (mis)management of the Greystone Hotel during its development, including through several entities that are either currently or previously co-owned with the Debtor, and including in the acts set forth hereinabove.

308.    More importantly, Dan Vosotas is himself a guarantor on several financings related to the Greystone Hotel.  Of those guaranties, Dan Vosotas is already a defendant in a suit for breach

---

01195-EPK asserting that BBM3 and Muhl were violating the automatic stay in the VOS CRE Bankruptcy. The adversary proceeding was dismissed roughly two months later.

[6] VOS CRE was also represented by Debtor's counsel in the VOS CRE Bankruptcy.

of a defaulted Payment and Completion Guaranty in connection with the QLICI New Markets Tax Credit Financing ("QLICI") for the Greystone Hotel project.[7]

309.    Suffice to say, several of the Creditors, namely BBM3, are also very significant creditors of Dan, at all relevant times.

310.    Litigation against the Debtor began in earnest in March 2021, and BBM3 ultimately secured the NY Judgment from that litigation in January 2022.

311.    The Debtor did not disclose any income from the above "payments" per the VOS CRE plan in his SOFA, nor has he produced any documents to demonstrate these funds were actually paid out after confirmation. To the extent the payments were made, the payments circumvented his creditor's charging order.

312.    At or around the same time, the Debtor "lost" his job at Dan's company – Trans Inns.  Prior to "termination" Trans Inns paid the Debtor at least $100,000 in annual W2 income, in addition to other benefits.

313.    Additionally, various "VOS" entities had purported changes in ownership and management, though Dan essentially and repeatedly testified that the person with the most knowledge and controlling the affairs of the entities was generally James.

314.    Following the entry of the NY Judgment and initiation of the Judgment Enforcement Action, the Debtor engaged in a scheme with his father to file documents with the

---

[7] As an aside, the QLICI suit is pending reconsideration of an order dismissing for lack of diversity jurisdiction. The dismissal was predicated on the Debtor's sworn statement, which he himself swore to contrary positions in a matter of weeks thereafter. These sworn statements took materially different positions regarding the Debtor's purported interest in Greystone Managing Member, LLC ("GMM").  The QLICI dismissal was based on the Debtor swearing to owning 50% of GMM (*See* Mot. To Clarify, Ex. A. [D.E. 28]), which he shortly contradicted in his Initial Schedules here swearing to no interest in GMM [D.E. 11], then again flip flopped to a third conflicting position in his Amended Schedules - alleging 100% interest in GMM [D.E. 36]

Florida Division of Corporations (Sunbiz) to systematically remove himself and insert his father as a manager, officer, director, and/or registered agent of a number of Debtor and D. Vosotas related entities. On information and belief, these filings were done as part of the Vostases' scheme to hinder and delay BBM3's collection efforts.

315.    Since then, Dan, Trans Inns, VOS CRE I, VOS Investments, and or their affiliates have funded the Debtor's life -- his living expenses, his credit card bills, his litigation, and even a $30,500 initial payment to his (and, also VOS CRE's) bankruptcy counsel to file this bankruptcy.

316.    Likewise, these affiliates have funded millions of dollars into new "Vosotas" ventures, including through VOS Investments LLC and the Portara Entities. 2004 Exam. of Debtor 126:22:24; see also 2004 Exam. of Debtor 121:7-17; See also 2004 Exam of D. Vosotas, 16:18-25 – 17:1-16.

317.    VOS CRE funded millions into VOS Investments. VOS Investments continued to be managed by the Debtor. Even through January 2023, the Debtor was still a (purportedly uncompensated) manager of VOS Investments.

318.    VOS Investments, in turn, funded the Portara Entities – a pre-petition real estate investment fund that is headquartered at the Debtor's home in Coral Gables.


### i.    The Debtor is a Ghost Director or Officer of Insiders' Businesses

319.    When prompted about rendering services for his "father's company[ies], the Debtor's explanation is simply "... I'm trying to create something. So I'm not doing it – I mean, VOS Investments might be an investor, but I'm doing it for my future. I've got to do something at some point, I haven't made money in years."  2004 Exam. of Debtor 140:9-15.

320.    Further, documents received from Cendrowski in the Main Case demonstrate the Debtor asking his CPAs for a variety of business-related deductions on his personal tax returns for expenses in connection with a home office, a car lease, and appeared to be intimately involved in the business of a preparation of taxes for Christina Vosotas LLC.

321.    The Debtor has made no disclosure in his Initial or Amended Schedules and SOFA, or otherwise, of any business for which the Debtor is earning income such that business-related deductions for expenses such as a home office or a car lease would be appropriate on his personal tax returns.

### i.    The Real Property Acquisition

322.    On or about September 8, 2021, the Debtor and his wife entered a contract to purchase the real property located at 1551 Delgado Ave, Miami, FL 33146 (the "Real Property")

323.    Prior to closing, the Debtor and his wife submitted at least one loan application to finance the purchase of the Real Property.  The relevant loan application was with EMM Mortgage (the "Loan Application").

324.    The Loan Application was sworn by the Debtor and his non-filing spouse.

325.    The Loan Application included certain representations about income, assets, and liabilities of the Debtor and his non-filing spouse, including that:

  i.    The Debtor and his non-filing spouse were each making $8,3333/month from Dan's company.

  ii.    In response to whether the Debtor was a co-signer, guarantor on any debt that is not disclosed in this application, the Debtor answered "No"

  iii.    When asked if the Debtor was a party to a lawsuit in which you have personal any personal financial liability, the Debtor answered "No"

326.    At the time of the Loan Application, the Debtor was a party a guarantor for tens of millions of dollars of debt related to the Greystone Hotel, was embroiled in litigation including but not limited to guaranty litigation underlying the New York Judgment, "shareholder" litigation in the Derivative Action, Michigan Investor Litigation, the EB-5 litigation in South Florida, a demand from the Chapter 7 Trustee of South Atlantic Regional *Center, LLC*, Case No. 19-bk-25762, and an investor demand from M. Asgarifard.

327.    The Loan Application underwriting documents also reflect that "both borrowers work for the same parent company, and were both furloughed from late June/early July 2020 through April 11, 2021. Both are now back full time."

328.    Not-so-coincidentally, the Debtor (and his wife) regained employment from furlough just over 3 months before entering the contract to purchase the Real Property and then was terminated yet again from his father's company less than three months after closing on the house, despite having predicated his application and ability to pay the mortgage from his income at his father's company.

329.    The Loan Application and underwriting documents also included representations that Dan was going to gift the down payment of $82,500 and buyers were to pay the balance of the cash to close, in excess of $150,000.

330.    In actuality, the Debtor's father's account wired all cash to close, including the first deposit, second deposit, and cash to close:

331.    Unsurprisingly, when asked in the Loan Application if the Debtor or his wife were obtaining any money from another party for this real estate transaction, the answer was "No."

332.    Ultimately the Debtor and his wife closed on the Real Property on or about October 14, 2023, less than 2 years before the Petition Date.

333.    Both Dan and James maintain that these payments were gifts and support by Dan.

334.    No gift tax return has been produced to date, nor any other document from either Dan or James evidencing the gift.

335.    Likewise, on information and belief, Dan does not claim James a dependent in the relevant tax years either.

336.    And while the Debtor and his wife were promptly terminated from Dan's company after purchasing a home with financing that required that W2 income to fund it, coincidentally, and on an ongoing basis, Dan has regularly paid the mortgage, while Debtor continues to work for free for his Dad's (and his former) companies, with the "hope" of making money someday.

337.    Of course, James did not seek the required consent from BBM3 with respect to entering the Real Property mortgage transaction, as required under the Greystone Hotel related personal guarantees.

338.    Even setting aside the Debtor's failure to secure requisite consent, James knew if he filled out the loan application truthfully with respect to personal guarantees and ongoing litigation, EMM never would have made the Real Property mortgage loan.

339.    In short, the transfers from Dan into the Real Property are either (1) veiled undisclosed non-exempt income/assets of the Debtor fraudulently converted into an asset claimed exempt or (2) fraudulent transfers with intent to hinder, delay, and defraud Dan's creditors, which would likewise warrant equitable remedies in and to the funds paid into the Real Property.

**D.  Debtor's False Oaths, Failure to Disclose Assets, and Deficiencies in the Bankruptcy**

340.    The general problem for the Debtor in this bankruptcy is that the Debtor has not been able to keep his story straight for several years now. He swears to what is convenient, wherever convenient and when confronted with his conflicting sworn statements and whether that

is okay, his explanation was ""No, it just means they're not coming from the same place." Debtor 2004 Exam, 297:16-19.

341.    Affidavits and sworn declarations sworn by the Debtor and his father in litigation spanning 4 states and against more than 50 other parties indicate <u>at least fifteen entities in the four-year period preceding bankruptcy where the Debtor was a member, manager, authorized representative, and/or key employee</u>.

342.    As many as an additional 4 entities (for a total of 19) have been discovered pursuant to Rule 2004 discovery in the Main Case. Meanwhile, these entities are not disclosed on the Debtor's Amended Schedules and SOFA.

343.    The Debtor likewise included one of these entities (VOS Investments LLC) on his Initial Schedules and SOFA only to remove it on the Amended Schedules and SOFA.

344.    Unsurprisingly, the 2004 discovery and testimony has since revealed VOS Investments to have millions of dollars in addition to being the funding vehicle for the Portara Entities and other new ventures.

**1.  Business Interests, Transfers Thereof, and Prior Sworn Statements**

345.    By way of example and not exhaustive, the following sworn statements have been made regarding the Debtor's ownership in various relevant entities over the last several years.

**a.  GMM:**

| GMM | Date | Context | Sworn Statement / Omission |
|---|---|---|---|
| | July 26, 2022 | MI Creditor's Exam | No Interest Claimed |
| | June 27, 2023: | Judgment Enforcement Action – Interrogatories | No Interest Claimed |
| | July 14, 2023 | QLICI Guaranty Action – Declaration in Support of Motion to Dismiss | 50% Ownership |

|  | August 4, 2023 | QLICI Guaranty Action – Supplemental Declaration in Support of Motion to Dismiss | 50% Ownership |
|--|--|--|--|
|  | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
|  | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 100% Ownership |

### b. VOS Holdings I:

| VOS Holdings I | Date | Context | Sworn Statement / Omission |
|--|--|--|--|
|  | February 12, 2021 | Dan Vosotas Affidavit in Michigan Investors Litigation | "VOS Holdings I, LLC is an investment company I own and manage with my son, James Vosotas, owns a 60.37% stake in VOS CRE." |
|  | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | 46% ownership |
|  | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | Undefined Ownership Interest |
|  | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
|  | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 100% Ownership |

### c. VOS Hospitality:

| VOS Hospitality | Date | Context | Sworn Statement / Omission |
|--|--|--|--|
|  | December 28, 2019 | Debtor 2019 Financial Statements | 50% Ownership |
|  | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | 50% Ownership |
|  | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | Undefined Ownership Interest |
|  | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | 50% Ownership |
|  | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 50% Ownership |

### d.  VOS CRE I:

| VOS CRE I | Date | Context | Sworn Statement / Omission |
|---|---|---|---|
| | December 28, 2019 | Debtor 2019 Financial Statements | 30.88% ownership |
| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | 50% ownership |
| | February 12, 2021 | Dan Vosotas Affidavit in Michigan Investors Litigation | "VOS Holdings I, LLC, an investment company I own and manage with my son, James Vosotas, owns a 60.37% stake in VOS CRE."<br><br>"I am also the manager of VOS CRE through a separate entity, VOS Manager I, which I own and control with James Vosotas 50%-50%." |
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | Undefined Ownership in |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | No Interest Claimed |

### e.  VOS Manager I:

| VOS Manager 1 | Date | Context | Sworn Statement / Omission |
|---|---|---|---|
| | February 12, 2021 | Dan Vosotas Affidavit in Michigan Investors Litigation | "I am also the manager of VOS CRE through a separate entity, VOS Manager I, which I own and control with James Vosotas 50%-50%." |
| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | 50% ownership |
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | Undefined Ownership Interest |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 50% Ownership |

### f.  VOS Associates, LLC:

| VOS Associates | Date | Context | Sworn Statement / Omission |
|---|---|---|---|
| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | "I believe I am a 50% owner." |
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | No Interest Claimed |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | No Interest Claimed |

### g.  Greystone Hospitality:

| Greystone Hospitality | Date | Context | Sworn Statement / Omission |
|---|---|---|---|
| | December 22, 2017 | Construction Loan Closing - Greystone Hospitality Certificate | 50% ownership |
| | July 18, 2021 | Derivative Action - Declaration in Support of Appointment of Receiver | Undefined, direct ownership - "I have ownership in and manage Greystone Hospitality, LLC" |
| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | "I am not a member of this entity, which is owned 99% by VOS CRE I." |
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | No Interest Claimed |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 50% Ownership |
| | January 24, 2024 | Debtor 2004 Exam, 292:23-293:1 | When asked if he owns a direct ownership in the entity, "I do not" |

### h.  DW Detroit, LLC:

| | Date | Context | Sworn Statement / Omission |
|---|---|---|---|

| DW Detroit, LLC | December 28, 2019 | Debtor 2019 Financial Statements | No Direct Ownership Interest Claimed, but claimed 25% ownership through the David Whitnney Building. |
|---|---|---|---|
| | February 12, 2021 | Dan Vosotas Affidavit in Michigan Investors Litigation | "My son James Vosotas and I are the sole members and owners of DW Detroit, LLC." |
| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | No Ownership Interest Claimd - "This entity owned a membership interest in Whitney Parnets and Whitney F&B, but it is now defunct since the sale of the David Whitney Building." |
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | Undefined Ownership Interest |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 50% Ownership |
| | January 24, 2024 | Debtor 2004 Exam, 306:20-307:3 | Represented the entity was disregarded and "a hundred percent of the beneficial interest flowed through VOS CRE" |

### i.  Whitney Managing Member, LLC:

| Whitney Managing Member, LLC | **Date** | **Context** | **Sworn Statement / Omission** |
|---|---|---|---|
| | December 28, 2019 | Debtor 2019 Financial Statements | No Direct Ownership Interest Claimed, but claimed 25% ownership through the David Whitney Building. |
| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | "I was a 25% member of this entity until the settlement agreement with the Roxbury Group in January 2021." |
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | No Interest Claimed |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 50% Ownership |

### j.  DCW Development, LLC:

| | **Date** | **Context** | **Sworn Statement / Omission** |
|---|---|---|---|

| DCW Development, LLC | December 28, 2019 | Debtor 2019 Financial Statements | No Direct Ownership Interest Claimed, but claimed 25% ownership through the David Whitney Building. |
| --- | --- | --- | --- |
| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | "I had a membership interest in this entity but have never been the recipient of any economic renumeration as that is legally required to be passed through to VOS CRE I" |
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | Undefined Ownership Interest |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 50% Ownership |

### k. DHB Construction, LLC:

| DHB Construction, LLC | **Date** | **Context** | **Sworn Statement / Omission** |
| --- | --- | --- | --- |
| | December 28, 2019 | Debtor 2019 Financial Statements | No Direct Ownership Interest Claimed, but claimed 25% ownership through the David Whitney Building |
| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | "This is the same as DCW Development, albeit with different ownership percentages." |
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | Undefined Ownership Interest |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 50% Ownership |

### l. Whitney Master Tenant:

| Whitney Master Tenant | **Date** | **Context** | **Sworn Statement / Omission** |
| --- | --- | --- | --- |
| | December 28, 2019 | Debtor 2019 Financial Statements | No Direct Ownership Interest Claimed, but claimed 25% ownership through the David Whitney Building |

| | July 5, 2022 | Debtor Sworn Affidavit in Michigan Judgment Enforcement Action | "I was never a member of this entity" |
|---|---|---|---|
| | June 27, 2023 | FL Judgment Enforcement Action - Interrogatories | Undefined Ownership Interest |
| | October 17, 2023 | Initial Schedules and SOFA [D.E. 11] | No Interest Claimed |
| | November 7, 2023 | Amended Schedules and SOFA [D.E. 36] | 50% Ownership |

346.     Both the Initial and Amended Schedules and SOFA are materially false, and contain numerous omissions. The Creditors have identified numerous undisclosed assets, transfers, along with material misstatements in the Debtor's schedules in the course of their investigation, including as set forth hereinbelow.

347.     Both the Debtor's Initial and Amended Schedules and SOFA contain non-disclosure of certain entities in which the Debtor either claimed an interest or his father, in sworn documents, represented the Debtor to have an interest within the 4 years preceding the Debtor's bankruptcy filing.

348.     The Debtor's Initial Schedules and SOFA did not disclose the Debtor's interest in

    *i.*    VOS Holdings I.
    *ii.*    VOS Manager I.
    *iii.*    DW Detroit, LLC.
    *iv.*    DCW Development, LLC.
    *v.*    DHB Construction, LLC.
    *vi.*    Whitney Managing Member, LLC.

349.     Neither the Debtor's Initial Schedules and SOFA nor the Amended Schedules and SOFA disclose the Debtor's interest in

    *i.*    VOS Associates.
    *ii.*    Greystone Hospitality.
    *iii.*    Whitney Master Tenant, LLC.
    *iv.*    Portara Capital Management LLC.
    *v.*    Portara Capital GP LLC.

      vi.     Portara Hospitality LLC.
     vii.     Portara LLC.
    viii.     Portara Master Fund.
     ix.     Portara Technologies Corporation.
      x.     95 Rockwell Place.
     xi.     Rockwell Place Finance.
     xii.     Rockwell Hospitality.
    xiii.     United EB-5 LLC.
    xiv.     DJV Enterprises LLC.

350.　Debtor's Amended Schedules and SOFA did not disclose the Debtor's interest in VOS Investments.

351.　On information and belief, the Debtor holds a present interest in and/or held an interest in within the four years preceding the Debtor's bankruptcy in each of the entities specified hereinabove.

352.　To the extent that the Debtor has transferred his interest in any of the entities specified hereinabove, he did not disclose such transfer in any fashion on his Initial or Amended Schedules and SOFA.

**2. VOS Holdings I Member Loans to Debtor**

353.　In disocery obtained in pre-petition discovery, BBM3 obtained two promissory notes payable to the Debtor, which were not disclosed on the Debtors Initial or Amended Scheduleds and SOFA:

     i.     Promissory Note dated February 15, 2015, with James Vosotas as lender and VOS Holdings I, LLC as borrower, in the principal amount of $436,950.00; and

     ii.     Promissory Note dated February 15, 2015, with James Vosotas as lender and VOS Holdings I, LLC as borrower, in the principal amount of $450,000.00.

(the "VOS Holdings I Member Loans").

354.     In the Debtor's sworn Florida Fact Information Sheet, submitted in the Judgment Enforcement Action, the Debtor represented that he was owed $880,000 for a member loan from VOS Holdings I.

355.     In the Judgment Enforcement Action, BBM3, in June 2022, served a Writ of Garnishment on VOS Holdings I.

356.     In response to the Writ of Garnishment, on June, 27, 2022, VOS Holdings I, LLC represented that it has been and remains indebted to Debtor in the amount of $886,950.00, plus interest accruing at a rate of fifteen percent (15.00%) per annum, from February 14, 2020 to present.

357.     The Debtor did not schedule the VOS Holdings I Member Loans on his Initial or Amended Schedules and SOFA, or otherwise disclose in any fashion in this bankruptcy.

### 3.    Undisclosed Income

358.     As set forth in Section IV(C)(4) *supra*, the Debtor essentially has been operating businesses and earning income through his thinly veiled effort to work for free for his father and wife and then live off their respective good graces.

359.     As set forth in Section IV(C)(4) *supra*, the Debtor also failed to disclose any payments he should have received pursuant to the VOS CRE I Amended Plan.

### 4.    Undisclosed Debts

360.     The Debtor did not schedule or otherwise disclose certain debts and obligations in either his Initial or Amended Schedules, including but not limited to:

     i.    FL Judgment

     ii.   The Guranties on which he is obligated to US Bank in connection with the Federal Historic Tax Credit financing.

iii.     The Payment and Completion Guaranty on which he is obligated to USDCBC

180 in connection with the QLICI New Markets Tax Credit financing.

iv.     Liability to BBM3 under the Recourse Obligations Guaranty and/or the

December 2015 Mortgage and associated December 2016 Side Letter.

**5.  The Trusts**

361.     In the Main Case, DJV Trust documents produced on April 22, 2024 by D. Vosotas

in the Main Case reflect that the Debtor is both the successor trustee and a direct beneficiary of the

DJV Trust.

362.     Further, the documents produced in the Main Case reflect that an additional DJV

Family Trust was created July 25, 2022 where the Debtor is the sole trustee and beneficiary and

where the Debtor was assigned 100% control of VOS Hospitality in addition to other business and

personal assets of the DJV Trust, DJV Enterprises LLC, and D. Vosotas.

363.     None of these trust interests are disclosed on Debtor's Initial or Amended

Schedules and SOFA.

364.     The Debtor did not disclose his control of the business and personal assets of the

DJV Trust, DJV Enterprises, or D. Vosotas on his Initial or Amended Schedules and SOFA.

365.     The Debtor did not disclose his 100% control of VOS Hospitality on his Initial or

Amended Schedules and SOFA.

**6.  Cryptocurrency and Digital Assets**

366.     During the Debtor 2004 Exam, a consensual review of the Debtor's phone revealed

the following cryptocurrency applications: Coin Market Cap; Open Seas; MetaMask; Ronin

Wallet; Trust; Coin Base. Debtor 2004 Exam, 28:20-25 – 39:1-4.

367.    The Debtor did not disclose any cryptocurrency accounts or funds in either of his Initial or Amended Schedules.

### 7.  **Portara**

368.    In August 2022, the Debtor, using his james.vosotas@transinns.com email address, registered the domain name of Portara.io.

369.    This is despite the Debtor's sworn statements in his Initial and Amended Schedules and SOFA and at the Debtor 2004 Exam that he is unemployed and was laid off by Trans Inns in January 2022 concurrently with the NY Judgement.

370.    Additionally, on September 16, 2022, both the entities Portara Capital Management, LLC and Portara Capital GP LLC were registered in Delaware.

371.    Publicly available information shows that The Portara Fund is marketed as a "Global Luxury Villa & Short Term Rental Real Estate Fund" by D. Vosotas on his LinkedIn.

372.    During testimony at his 341 Meeting of Creditors and at the Debtor 2004 Exam, the Debtor acknowledged that the Portara company was formed by him and his father.

373.    Additionally, the Debtor's 2004 Exam testimony was that VOS Investments (an entity the Debtor scheduled an interest on his Initial Schedules and SOFA but removed on his Amended Schedules and SOFA) funded Portara's research, development and legal costs.

374.    Shortly after the Debtor's 2004 Exam, Portara launched its website which markets to and solicits investments from U.S. investors for an unregistered offshore fund. The website contains a company page that identifies four "team members" (the first being the Debtor) with links to their respective LinkedIn pages.

375.    The Creditors' investigation has revealed, at a minimum, seven of the Portara Entities, as defined in Section III(B) *surpra*.

376.    The Debtor has made no disclosure of corporate documents, bank accounts, financials, or funds received by or from the Portara Entities.

### 8.    Undisclosed Transfers

377.    Discovery received in the Main Case from Debtor's former accounting professionals, Cendrowksi, revealed that the Debtor's tax refunds were deposited into D. Vosotas's account for a decade, which coincided with the time period in which the Debtor began receiving notices regarding default of various obligations related to the Greystone Hotel Project.

378.    Upon information and belief, during this period, the Debtor's personal tax refunds were previously received at the building shared by Cendrowski and Trans Inns for deposit into the "VOS Account".

379.    Further, documents received from Cendrowski in the Main Case demonstrate that in early 2022, assumed control and direction of the accounting professionals at Cendrowski.

380.    Specifically, on January 19, 2022 – just two weeks after the entry of the NY Judgment against the Debtor – the Debtor's wife directed Cendrowski to direct the Debtor's entire 2020 tax refund to her despite the income for such all being attributable to the Debtor.

381.    To the extent any of the Debtor's tax refunds that were otherwise payable to the Debtor in the two years preceding the bankruptcy filing were instead transferred to the Debtor's father, the Detbor's wife, or any other individual or entity, such were required to be disclosed in both his Initial and Amended Schedules and SOFA, Schedules and SOFA, at SOFA Part 7, Item 18. Yet, on both his Initial and Amended Schedules and SOFA, the The Debtor has made no disclosure of the transfer of his tax refunds to any person or entity

382.    On information and belief there are other undisclosed transfers to or for the benefit of the Debtor's wife which were not disclosed in the Debtor's Schedules or SOFA.

### 9.   Other Material Non-Disclosures

383.    In addition to the Debtor's failure to disclose his control of the business and personal assets of the DJV Trust, DJV Enterprises, or D. Vosotas, the Debtor also failed to disclose – in his Initial or Amended Schedules and SOFA, or otherwise – his control, direction, and involvement of various entities, including, but not limited to Trans Inns (an entity of which D. Vosotas owns 100%).

384.    Specifically, at his 2004 examination, D. Vosotas testified that the Debtor was the point person for all Trans Inns litigation, had an ongoing role in management, operations, development, acquisitions, and soliciting investors - stating that the Debtor helped with everything. Dan Vosotas 2004 Exam, 76:21-25 – 81:1-15.

385.    Dan Vosotas also identified the Debtor as the person with the most knowledge regarding Greystone Hospitality, VOS Manager I, VOS Holdings, VOS CRE I, VOS Investments Dan Vosotas 2004 Exam, 64:13-15; 85:10-13 ("James is always more knowledgeable in most things actually"); 86:20 – 87:1-12 ("There are so many damn ones, I don't know"); 88:21- 89:9; 90:2-13; 149:12-14.

### 10. Debtor's Failure to Keep, Failure to Preserve, and Destruction of Records

386.    As a threshold matter, the Debtor testified at the Debtor 2004 Exam on January 24, 2024 that he produced everything he had, and was "just going to resubmit." Debtor 2004 Exam, 17:19-122.

387.    The Debtor, in addition to his requirements as a Debtor under the Bankruptcy Code, has a heightened requirement for record keeping as a member and/or manager of a variety of business entities referenced herein, including, but not limited to, obligations arising under various entity operating agreements and other corporate documents.

388.    On information and belief, the Debtor did not conduct or cause to be conducted a search of the Debtor's computer or device harddrives for responsive information or documentation.

389.    On information and belief, the Debtor did not conduct or cause to be conducted a search of the Debtor's computer or device harddrives for responsive information or documentation.

390.    On information and belief, the Debtor did not conduct or cause to be conducted a search of the Debtor's several e-mail addresses for responsive information or documentation.

391.    On information and belief, the Debtor did not conduct or cause to be conducted a search of the Debtor's phone applications for responsive information or documentation.

392.    On information and belief, the Debtor did not request his pre-petition professionals, business partners, or others individuals or entities in possession of his records that are under his care, custody, or control, for responsive information or documentation.

393.    The Debtor has willfully failed to adequately keep, maintain, or preserve financial records, and has done so without any adequate justification, all of which has been to the detriment to the Creditors and the administration of the Estate.

394.    In addition to being under BBM3's Rule 2004 subpoena for six months, the Debtor has been either a direct party or an active party in a variety of litigation with BBM3, a variety of third parties, and the Creditors for 5 years. The Debtor has been under a duty to preserve and maintain discoverable records since at least 2019.

395.    On information and belief, the Debtor has failed to do so.

396.    Third-party discovery received from the Debtor's professionals at Cendrowski discovery evidences that the Debtor was, always, and is still the primary person in control - even with respect to the financial and business affairs of D. Vosotas as is confirmed by the production by D. Vosotas of DJV Trust and DJV Enterprises, LLC documents in the Main Case.

397.    Yet, in addition to the Debtor's failures to meaningfully search and obtain responsive documents and produce the same, the Debtor's family members and related entities have largely refused to produce documents in response to Rule 2004 subpoenas in the Main Case.

398.    While the Debtor has attempted to explain away his non-compliance by conveniently pointing the finger at his father or other non-parties, BBM3's discovery directed at D. Vosotas or other related parties has given no assurance that any third party is preserving discoverable material.[8]

399.    Only heightening this concern is the recent disclosure by present counsel for Dan Vosotas, MMH (who previously represented the Debtor for much of the Judgment Enforcement Action), that an ESI database created and maintained pursuant to agreed-upon discovery protocols in the Derivative Action was suspended in November 2023 and that counsel is unable to access the same unless BBM3 fronts the large expense for the reactivation of the database.

400.    By way of example and not litmation, with respect to the "greystonehotelmiami.com" url and attendant email accounts, the Debtor has represented through counsel, he doesn't use it nor have access to it.

---

[8] At his 2004 examination, the Debtor's father plainly testified that many documents BBM3 is seeking from him are no longer available due to his destruction of them:

A: Most of the documents I don't have access to, to tell you the truth.

Q: Can you give me an example of that?

A: A lot of it has been deleted, a lot of the old companies that are no longer doing business, a lot of the, just, stuff is -- I moved from Michigan. My CFO is no longer working for me, a lot of documents are no longer available.

Q: Okay. Help me understand, what was deleted?

A.  Oh, I have no idea, I'd have to look.

D. Vosotas 2004 Exam, 10:18 – 11:2

401.    Notwithstanding, in discovery obtained pre-petition, the Creditors received emails from the Debtor's email address from the "greystonehotelmiami.com" url that were dated within the 2 years prior to this bankruptcy. Yet this email account is either inaccessible, destroyed, or otherwise not preserved, let alone turned over – all without explanation from the Debtor as to his efforts to obtain and/or access the same.

**11. Failure to Adequately Explain or Account for Loss or Diminution in Assets**

402.    Within the 4 years preceding the petition date, the Debtor's submission of financial statements, tax returns, and other disclosures demonstrating significant personal wealth. Coincidentally, with BBM3's judgment against the Debtor looming in early 2022, the Debtor's assets, employment, income, and business interests systematically vanished.

403.    Conversely prior to the BBM3's judgment against the Debtor, he and his father made sworn statements in various third-party litigation that they were equal partners and had consistent ownership interests in almost every relevant entity, hotel, and business. See Section III(C)(2), *supra*.

404.    The Debtor has testified several times in the Main Case, including at his Meeting of Creditors and at the Debtor 2004 Exam. Yet, he has been unable or unwilling to either produce documents or provide adequate explanations for where the assets he swore to having in the 4 years preceding the bankruptcy went (including, but not limited to, the loss, dimunition, or transfer of all such assets).

405.    During the course of the Debtor 2004 Exam, the Debtor was evasive and failed to provide adequate explanation for his present and past business interests, failed to provide adequate explanation for the sudden loss and dissipation of his assets and income following the entry of

BBM3's judgment against him, failed to adequately explain the deficiency in his records, and failed to provide adequate explanation regarding his financial affairs.

## V.     RESERVATION OF RIGHTS

406.    The Creditors each reserve their respective right to amend, modify and/or supplement these and other allegations contained in this Complaint, and causes of action against the Debtor/Defendant or persons or parties affiliated with the Debtor/Defendant based on their further investigation and as administration of the Debtor's Estate continues.

## VI.     CAUSES OF ACTION

### COUNT I
### *Exception from Discharge Pursuant to 11 U.S.C. § 523(a)(2)(A)*
### **(BBM3, Greystone Tenant, Santa Barbara, and Muhl Against Defendant)**

407.    Plaintiffs, BBM3, Greystone Tenant, Santa Barbara, and Muhl adopt, reallege and reaffirm the allegations contained in Paragraphs 1 through 406 above, as if fully and expressly set forth herein, and further allege as follows:

408.    Section 523 of the Bankruptcy Code provides, in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> …
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ….

11  U.S.C. § 523(a)(2)(A).

409.    As set forth and alleged herein, through false pretenses, false representations, and/or actual fraud, the Debtor obtained money, services and/or extension of credit through, including, but not limited to:

     i.    inducement of BBM3 to enter into and finance the Project;

    ii.    inducement of Muhl to enter to and finance the Project, enter into substantial, personal guarantees of various Project-related financing;

   iii.    inducement of Santa Barbara and Greystone Tenant contribute money and serve as lenders to the Project;

   iv.    inducement of BBM3 to funding all Project-related transactions from 2016 through present, including, but not limited to purchase of the Construction Loan and advancement of substantial, additional funds above and beyond the maximum loan amount; and to advance loan funds for specific use, which were then misappropriated by the Debtor for personal and unrelated business expenses; and

    v.    inducement to fund false draw requests under the applicable loans.

410.   In order to induce the above-referenced Plaintiffs, the Debtor made false representations knowingly and with the intent to defraud, as alleged herein, including but not limited to, misrepresentations regarding the Vosotases' financial condition; business acumen; ability and intention to repay; and the intention to abide by all attendant applicable legal representations, contractual assurances, warranties and covenants contained in all applicable loan documents, guarantees, fiduciary duties, operating agreements, management agreements and corporate governance documents, among other documents alleged herein, and false representations to induce the funding of false draw requests.

411.   As alleged herein, the Plaintiffs referenced herein reasonably relied, to their detriment, upon the Debtor's false and fraudulent misrepresentations, through financing of the

Project, guarantees of substantial indebtedness related to the Project, performance of services, and advances and extension of credit, among other bases alleged herein.

412.    The Debtor received the benefit of the fraud, which included, but is not limited to, the creation and initial funding of the Project, the continued funding of the Project, from which the Debtor wrongfully received money and services derived through the fraud alleged herein.

413.    As a direct and proximate result of the Debtor's unlawful and fraudulent acts, the Plaintiffs BBM3, Greystone Tenant, Santa Barbara, and Muhl referenced herein were damaged, with such amount being nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(2)(A).

**WHEREFORE**, Plaintiffs BBM3, Greystone Tenant, Santa Barbara, and Muhl respectfully request this Court enter a judgment against Debtor determining that the claims Plaintiffs have asserted and/or may assert against the Debtor-Defendants are not dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and awarding any other relief this Court deems just and proper.

## <u>COUNT II</u>
### *Exception to Discharge Pursuant to 11 U.S.C. § 523(a)(2)(B)*
**(BBM3, Greystone Tenant, Santa Barbara and Muhl against Defendant)**

414.    Plaintiffs BBM3, Greystone Tenant, Santa Barbara and Muhl adopt, reallege and reaffirm the allegations contained in Paragraphs 1 through 406 above, as if fully and expressly set forth herein, and further allege as follows:

415.    Section 523 of the Bankruptcy Code provides, in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> …
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

…

**(B)** use of a statement in writing—

    **(i)** that is materially false;

    **(ii)** respecting the debtor's or an insider's financial condition;

    **(iii)** on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

    **(iv)** that the debtor caused to be made or published with intent to deceive

11 U.S.C. § 523(a)(2)(B).

416.    The Debtor obtained money from BBM3 and services, property and/or other consideration from Muhl, Greystone Tenant, Santa Barbara through the use of a statement(s) in writing regarding the Debtor's and/or insider's financial condition.

417.    Through representations made by the Debtor in the various corproate, transactional and loan documents alleged herein, the Debtor made false representations regarding his and his insider's financial condition and wherewithal.

418.    The representations made by the Debtor were materially false.

419.    BBM3, Muhl, Greystone, Santa Barbara reasonably relied, to their detriment, upon the Debtor's fraudulent misrepresentations in entering into the Project, financing the Project, advancing substantial, additional funds under the loans, and entering into a series of corporate, transactional and financial obligations in connection with the Project. .

420.    The Debtor caused the caused the false statsments to be published and presented to the Plaitniffs referenced herein with the intent to deceive.

421.    Accordingly, the Plaintiffs referenced here were damaged, with such amount being nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(2)(B).

**WHEREFORE**, Plaintiff BBM3, Muhl, Greystone, Santa Barbara respectfully request this Court enter a judgment against Debtor determining that the claims it has asserted and/or may

assert against the Debtor are not dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(B) and awarding any other relief this Court deems just and proper.

### COUNT III
**Exception to Discharge Pursuant to 11 U.S.C. § 523(a)(4)**
**(BBM3, Greystone Tenant, Santa Barbara, GHM, GMT,**
**GMM, Holdco, and Muhl Against Defendant)**

422.    Plaintiffs adopts, realleges and reaffirms the allegations contained in Paragraphs 1 through 406 above, as if fully and expressly set forth herein, and further allege as follows:

423.    Section 523 of the Bankruptcy Code provides, in relevant part:

>   (a) A discharge under section 727, 1141, 1228(a), 1228(b)
>   or 1328(b) of this title does not discharge an individual
>   debtor from any debt –
>
>   …
>
>   (4) for fraud or defalcation while acting in a fiduciary
>   capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

424.    The Debtor committed fraud through defalcation or embezzlement while acting in a fiduciary capacity arising from his position as a guarantor of the indebtedness and other fiduciary responsibilities alleged herein to BBM3, Greystone Tenant, and Santa Barbara, role as a member and/or manager of GHM, GMT, GMM, Holdco, and as a business partner and co-member and/or manager and business of various entities with Muhl.

425.    The Debtor, with complete disregard for his fiduciary obligations committed defalcation or embezzlement with respect to the foregoing Plaintiffs through fraudulent misrepresentations which resulted in the misappropriation of loan funds specifically allocated for the Project, misappropriation of entity funds, a multitude of litigation, claims and damages against the Plaintiffs referenced herein.

426.     Further, and by way of example and not limitation, the Debtor through fraud misrepresentation committed defalcation and embezzlement through misappropriation of millions of dollars advanced under the Construction Loan funds of Greystone Tenant and Santa Barbara through the use and presentment of false affidavits and draw requests to BBM3 – all as part of the Debtor's fraudulent scheme to siphon money off the Project that he kept afloat through fraudulent inducements to BBM3 to fund the project and purchase and continue funding of the Construction Loan.

427.     Additionally, following his removal as manager of GMT in December 2020, the Debtor committed defalcation and embezzlement through his draining of all funds remaining in the GMT Bank of America account by using the GMT account funds to pay a variety of VOS Hospitality vendors which were not valid vendors of the Project.

428.     Additionally, the Debtor fraudulently embezzled funds from GHM leading to GHM being sued in the SARC bankruptcy.

429.     The Plaintiffs referenced herein have incurred damages in connection with the Debtor's fraud, defalcation and embezzlement, with such amount being nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(4).

**WHEREFORE**, Plaintiffs BBM3, Greystone Tenant, Santa Barbara, GHM, GMT, GMM, Holdco, and Muhl respectfully request this Court enter a judgment against Debtor determining that the claims Plaintiffs have asserted and/or may assert against the Debtor are not dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and awarding any other relief this Court deems just and proper.

<u>**COUNT IV**</u>
***Exception to Discharge Pursuant to 11 U.S.C. § 523(a)(6)***
**(All Plaintiffs against Defendant)**

430.    Plaintiffs adopt, reallege and reaffirm the allegations contained in Paragraphs 1 through 406 above, as if fully and expressly set forth herein, and further allege as follows:

431.    Section 523 of the Bankruptcy Code provides, in relevant part, that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> …
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity ….

11 U.S.C. § 523(a)(6).

432.    As set forth and alleged herein, the Debtor acted willfully and with malicious intent to cause harm to Plaintiffs.

433.    As set forth more alleged herein, and by way of example and not limitation, the Debtor acted with malicious intent to cause harm by:

    i.    Intentionally and improperly initiating litigation to obtain a receiver over Holdco (and collateral pledged to BBM3) in violation of the Holdco Operating Agreement and in breach of the Holdco Pledge and Security Agreement in favor of BBM3.

    ii.    Intentionally and tortiously interfering with BBM3's legitimate efforts to collect on the NY Judgment.

    iii.    Initiating litigation against Holdco (following the Debtor's removal as manager) for indemnification in direct contravention of the Holdco Operating Agreement and certain guarantees of the Debtor.

iv.    Causing the PHG Litigation against GMT in connection with a contract that the Debtor improperly caused GMT to enter into with VOS Hospitality without the required BBM3 consent pursuant to operative Loan agreements and without Muhl's approval and consent required pursuant to the operative operating agreements.

v.    Intentionally and tortiously interfering with the business operations of Greystone-related entities (including, but not limited to, GMT, GMM, Holdco, Santa Barbara, and GHM), following his removal as manager, through the filing of false documents with the Florida Division of Corporations.

vi.    Intentionally and tortiously interfering with and clouding legal title to GMM through false declarations preceding the bankruptcy and in the Amended Schedules and SOFA regarding his purported ownership interest.

vii.    Fraudulently embezzling funds from GHM leading to GHM being sued in the SARC bankruptcy.

434.    The Debtor's actions were wrongful and without just cause.

435.    As such, Plaintiffs have been damaged have incurred damages in connection with the Debtor's willful and malicious injury, which is not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(6).

**WHEREFORE**, Plaintiffs respectfully request this Court enter a judgment against Debtor determining that the claims Plaintiffs have asserted and/or may assert against the Debtor-Defendants are not dischargeable pursuant to 11 U.S.C. § 523(a)(6) and awarding any other relief this Court deems just and proper.

## COUNT V
### Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(2)
### (All Plaintiffs Against Defendant)

436.    The Plaintiffs adopt, reallege and reaffirm the allegations contained in Paragraphs

1 through 406 above, as if fully and expressly set forth herein, and further allege as follows:

437.    Section 727(a)(2) of the United States Bankruptcy Code provides the following

exception to the general discharge provisions:

> (a) The court shall grant the debtor a discharge, unless—
>     (2) the debtor, with intent to hinder, delay, or defraud a
> creditor or an officer of the estate charged with custody of property
> under this title, has transferred, removed, destroyed, mutilated, or
> concealed, or has permitted to be transferred, removed, destroyed,
> mutilated, or concealed—
>     (A) property of the debtor, within one year before the date of
> the filing of the petition; or
>     (B) property of the estate, after the date of the filing of the
> petition;

11 U.S.C. § 727(a)(2).

438.    Based on the Debtor's actions, including those described above, the Plaintiffs

allege that the Debtor has, with intent to hinder, delay, or defraud a creditor or an officer of the

Estate, transferred, removed, destroyed, mutilated, or concealed, or have permitted to be

transferred, removed, destroyed, mutilated, or concealed, property of the Debtor, within one (1)

year before the date of the filing of the petition and/or property of the Estate, and after the date of

the filing of the petition.

439.    As a result of the Debtor's transfers and concealments, certain assets, namely the

income and business interests disguised by the Debtor, the bankruptcy estate is likely unable to

recover and administer assets of the Estate.

**WHEREFORE**, for the reasons set forth herein, the Plaintiffs respectfully request the Court deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2), and for such other relief as is just and proper under the circumstances.

**COUNT VI**
***Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(3)***
**(All Plaintiffs Against Defendant)**

440.    The Plaintiffs adopt, reallege and reaffirm the allegations contained in Paragraphs 1 through 406 above, as if fully and expressly set forth herein, and further allege as follows:

441.    Section 727(a)(3) of the Bankruptcy Code provides the following exception to the general discharge provisions:

> (a)The court shall grant the debtor a discharge, unless—
>        (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3).

442.    The purpose of § 727(a)(3) is to make full financial disclosure a condition precedent to the court's grant of discharge, *see Broad Nat. Bank v. Kadison*, 26 B.R. 1015 (D.N.J.1983), and to ensure that the trustee and creditors are supplied with dependable information on which they can rely in tracing the debtor's financial history. *See Matter of Esposito*, 44 B.R. 817 (Bankr. S.D. N.Y. 1984).

443.    The Debtor on numerous occasions failed to produce records, documents and other information related to his financial affairs, let alone produce sufficient records that comport with the duty required of a Debtor in such circumstances to overcome an objection to discharge under (a)(3).  *See e.g. In re Hyder*, 38 B.R. 467 (Bankr. D. Mass. 1984).

444.    Debtor's repeated concealment, destruction, and/or failure to keep or preserve records materially impaired the Plaintiffs' ability to trace the Debtor's financial history. Likewise, the Debtor's actions and omissions with respect to his records have hampered the administration of the estate, to the detriment of the estate and its creditors. The Debtor's failure to adequately keep, maintain, or preserve financial records is done without any adequate justification.

445.    Based on the Debtor's actions described above, the Plaintiffs believe and allege that the Debtor has failed to keep or preserve records from which his financial condition may be ascertained, or the Debtor has concealed or destroyed any records that may have existed.

**WHEREFORE,** for the reasons set forth herein, the Plaintiffs respectfully request the Court deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3), and for such other relief as is just and proper under the circumstances.

### COUNT VII
*Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A)*
**(All Plaintiffs Against Defendant)**

446.    The Plaintiffs adopt, reallege and reaffirms the allegations contained in Paragraphs 1 through 406 above, as if fully and expressly set forth herein, and further allege as follows:

447.    Section 727(a)(4)(A) of the Bankruptcy Code provides the following exception to the general discharge provisions:

> (a)The court shall grant the debtor a discharge, unless—
>> (3) the debtor knowingly and fraudulently, in or in connection with the case—
>>> (A) made a false oath or account

11 U.S.C. § 727(a)(4)(A).

448.    The Debtor has, on several occasions, made false statements under oath concerning their assets. Such statements have been made on his Initial Schedules and SOFA, at the 341 Meeting, Amended Schedules and SOFA, and at the Debtor's 2004 Examination.

449.    The Debtor has also deliberately omitted information connected to his bankruptcy, which warrants denial of a discharge. Deliberate omissions by the debtor may also result in the denial of a discharge. *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984).

450.    Based on the Debtor's actions described above, the Plaintiffs believe and allege that the Debtor has knowingly and fraudulently, in connection with his bankruptcy case, made numerous and material false oaths or accounts to warrant denial of discharge.

**WHEREFORE,** for the reasons set forth herein, the Plaintiffs respectfully request the Court deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4), and for such other relief as is just and proper under the circumstances.

### COUNT VIII
*Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(5)*
**(All Plaintiffs Against Defendant)**

451.    The Plaintiffs adopt, reallege and reaffirm the allegations contained in Paragraphs 1 through 406 above, as if fully and expressly set forth herein, and further allege as follows:

452.    Section 727(a)(5) of the Bankruptcy Code provides the following exception to the general discharge provisions:

> (a) The court shall grant the debtor a discharge, unless—
>> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a)(5)

453.    In the 4 years preceding the petition date, the Debtor submitted financial statements, tax returns, and other financial disclosures demonstrating significant personal wealth. Further, in the 4 years preceding the petition date, the Debtor and his father made sworn statements in various

litigation representing themselves to be equal business partners with consistent ownership interests in relevant entities, hotels, and businesses ventures.

454.    Following the entry of BBM3's judgment in early 2022 - and with Creditors' claims looming - and through the petition date, the Debtor's assets, income, and business interests have been dissipated, transferred, and/or concealed.

455.    In the Main Case, the Debtor has failed to adequately explain through testimony, or provide documents in Rule 2004 discovery, the loss, diminution and/or transfer of his assets over the four years preceding his bankruptcy.

456.    Since the Debtor has not and cannot provide an explanation the loss or deficiency of assets to meet his liabilities, the Debtor's discharge must be denied.

**WHEREFORE**, for the reasons set forth herein, the Plaintiffs respectfully request the Court deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(5), and for such other relief as is just and proper under the circumstances.

Dated: May 7, 2024              Respectfully submitted,

DUNN LAW, P.A.
*Counsel for the Creditors*
66 West Flagler Street, Suite 400
Miami, Florida 33130
Tel: 786-433-3866
Fax: 786-260-0269
michael.dunn@dunnlawpa.com

By: */s/ Michael P. Dunn*
        Michael P. Dunn, Esq.
        Florida Bar No. 100705
        Jerrod M. Maddox, Esq.
        Florida Bar No. 117820